[No. F036962. Fifth Dist. May 23, 2002.]

EDWARD M. KASHIAN, Plaintiff and Appellant, v.
RICHARD L. HARRIMAN et al., Defendants and Respondents

**COUNSEL**

Kimble, MacMichael & Upton, Jon Wallace Upton, Mary Ann Bluhm and Robert W. Branch for Plaintiff and Appellant.

Law Office of Myron F. Smith and Myron F. Smith for Defendants and Respondents.

**OPINION**

**BUCKLEY, J.**—Edward M. Kashian brought this action against Richard L. Harriman and Valley Advocates (collectively Harriman) for what he alleged were Harriman's unfair business practices and defamatory statements about him. Harriman filed a special motion to strike Kashian's complaint pursuant to section 425.16 of the Code of Civil Procedure,[1] or what is commonly known as the anti-SLAPP statute. (SLAPP is an acronym for strategic lawsuit against public participation.) The trial court granted Harriman's motion as to all causes of action, and Kashian has appealed. We will affirm.

### FACTUAL AND PROCEDURAL HISTORY

Kashian is a prominent businessman and civic leader in Fresno, who, when this dispute arose, was serving as chairman of the board of trustees of Community Hospitals of Central California (CHCC or Community), a non-profit, tax-exempt corporation.

Harriman is an attorney in Fresno who has filed numerous public interest lawsuits on behalf of various environmental interests in the San Joaquin Valley, including Valley Advocates. The present controversy arose in an entirely different context, however.

In 1999, some local medical providers and advocacy groups became concerned about CHCC's plan to build and operate a for-profit heart hospital in north Fresno in partnership with a group of local physicians. Harriman

---

[1]Except as noted, all further statutory citations refer to the Code of Civil Procedure.

represented one such provider, Kratzer-Graves Pediatrics (KGP). According to news reports at the time, KGP once had been part of Valley PrimeCare Medical Providers, Inc. (Valley PrimeCare), a physicians group that filed for bankruptcy protection in 1997, and whose assets subsequently were sold to Community. Harriman had been retained by the bankruptcy trustee to serve as special counsel for the bankruptcy estate.

In May of 2000, again according to news reports, some of the concerned groups wrote to the division of charitable trusts within the Attorney General's office, seeking an investigation into Community's activities on several grounds, including their concerns that Community's involvement in a for-profit hospital (in direct competition with them) would conflict with its status as a tax-exempt corporation, and would interfere with its completion of a regional medical center in downtown Fresno (under a contract with the county to provide indigent medical care).[2] Among the organizations that wrote such letters were Saint Agnes Medical Center (St. Agnes) and the Local Health Care Coalition (LHCC).

*Harriman's Letter*

On May 22, 2000, Harriman wrote a similar letter on behalf of KGP and Valley Advocates, joining in the request for a formal investigation of Community's tax-exempt status.[3] According to the letter, Harriman, in his role as special counsel for the bankruptcy estate of Valley PrimeCare, had for the past two years been conducting his own investigation of CHCC and two related business entities. The information he had uncovered in the course of this investigation, he wrote, had led him to believe "that all three entities have been engaged in unfair business practices since at least 1995, in violation of Business & Professions Code § 17200." "Specifically, the facts support an intentional course of conduct and practice by CHCC [and the

---

[2]Section 12598, subdivision (a) of the Government Code provides in part: "The primary responsibility for supervising charitable trusts in California, for insuring compliance with trusts and articles of incorporation, and for protection of assets held by charitable trusts and public benefit corporations, resides with the Attorney General. The Attorney General has broad powers under common law and California statutory law to carry out these charitable trust enforcement responsibilities. . . ."

[3]Enclosed with Harriman's letter were copies of news articles that had appeared in the Fresno Bee on May 10 and May 16, 2000. The copy of Harriman's letter attached to Kashian's complaint did not include the two articles (apparently because Kashian had not received them). Harriman now asks us to take judicial notice of them, as well as several other documents. We take notice of the articles only insofar as they help to put the letter into context, and not for the truth of anything stated in them. (See *Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1064 [31 Cal.Rptr.2d 358, 875 P.2d 73].) We decline to take notice of the other documents because they are not relevant to our discussion. (*Id.* at. p. 1063.)

other two entities], and its counsel of interfering with the professional medical practices of private practitioners, including . . . Valley PrimeCare Medical Providers, Inc. (VPC) and Kratzer-Graves Pediatrics (KGP), toward the end of driving them out of business so that CHCC and its related entities could acquire the business of the competing physicians and their medical groups. . . ."

In his letter, Harriman requested the Attorney General's Office also conduct an investigation into a possible conflict of interest between Kashian's private business interests and his role as chairman of the CHCC board. It is this part of the letter that would precipitate the present lawsuit. Harriman wrote, in part: "My clients and others believe that, although Mr. Kashian has been careful to avoid appearing that he has an actual or potential pecuniary interest in the transactions of CHCC, a careful investigation will disclose that there are substantial economic advantages which have accrued to Mr. Kashian and/or business entities with which he has an ownership relationship or was involved in forming and/or engaging [*sic*] other property transactions which included land originally acquired, developed, owned, and/or sold by Mr. Kashian, either through partnerships, joint ventures, silent partnerships, and/or indirect ownership, such as medical offices or other commercial property ventures."

At the end of the letter is a notation indicating Harriman sent a copy to "Clients."

### The Fresno Bee Article

On June 1, 2000, the Fresno Bee published a news article reporting on Harriman's letter, under the headline "Hospital official assailed." The article focussed primarily on the accusations about Kashian, and quoted parts of the letter, including the excerpt cited above. Kashian was quoted in the article as saying the accusations were " 'completely false.' " Harriman reportedly refused to comment on the letter when contacted by a Bee reporter.

The same article also appeared on the Bee's Internet Web site.

### Kashian's Lawsuit

On June 19, 2000, Kashian, on behalf of himself and members of the public, filed a lawsuit against Harriman and Valley Advocates, asserting three causes of action. The first was for unfair and deceptive business practices in violation of section 17200 of the Business and Professions

Code.[4] Kashian alleged that Valley Advocates, and some other organizations on whose behalf Harriman had filed environmental lawsuits, were, in fact, one and the same entity, different in name only. Further, he alleged each organization was: ". . . a mere shell and sham conceived by Harriman and used by Harriman as his alter ego and a device Harriman uses to create the false impression that a public interest group or an environmental group supports and sponsors the numerous lawsuits filed by Harriman in which entities like Valley Advocates appear as a plaintiff being represented by Harriman, when in fact said lawsuits are filed for Harriman's own personal and individual business purposes and used by Harriman as a form of false advertising in order to enable him to recruit unsuspecting clients who are asked to join in the purported public interest cause being pursued by Harriman." Harriman's purpose in filing these lawsuits, according to Kashian, was not to advance the public interest but "to extort settlements and reap the financial benefits to Harriman from the amounts paid by the various named defendants, many of them public entities funded by taxpayers, which named defendants choose to settle such suits in order to avoid the costs inherent in defending such suits." On this basis, Kashian sought an order enjoining Harriman from filing or pursuing such lawsuits in the future, and directing him to account for and repay all funds recovered through the ones filed in the past.

Kashian's second and third causes of action were for defamation, and overlapped one another to some degree. Both alleged Harriman's letter was false and defamatory inasmuch as it "stated or lead [sic] the reader to believe that Mr. Kashian had used his position on the board of Community Medical Centers to advance his own financial interest improperly and in a dishonest, unethical or illegal manner." Both also alleged Harriman had been negligent by failing to verify the truth and accuracy of statements in the letter. The second cause of action was directed primarily at Harriman's delivery of the letter to the Attorney General's Office. The third cause of action was focussed on the letter's appearance in the newspaper, and alleged Harriman, "deliberately and with actual malice, published these false [and defamatory] statements by sending or causing to be sent a copy of this letter to the Fresno Bee . . . ."

### Harriman's SLAPP Motion

Harriman filed a special motion to strike Kashian's complaint on July 19, 2000. He argued that both his environmental litigation activities and his

---

[4]Section 17204 of the Business and Professions Code confers standing to bring an action for unfair competition on "any person acting for the interests of itself, its members or the general public." A "person" may include a corporation or other organization. (Bus. & Prof. Code, § 17201.)

letter to the Attorney General were absolutely privileged (Civ. Code, § 47, subd. (b)), and failed in any event to constitute a deceptive business practice or an actionable defamation, respectively. In his accompanying declaration, Harriman specifically denied Kashian's allegations about the purposes behind his environmental litigation.

As for Kashian's defamation claims, Harriman acknowledged sending his letter to the Attorney General. And he said he also sent copies to his clients (presumably Valley Advocates and KGP) and to the two other organizations with which he was joining to request an investigation of CHCC (presumably St. Agnes and LHCC). But he declared: "at no time did I provide a copy of the letter, or of its contents, nor did I arrange for the letter to be conveyed, to the Fresno Bee."

Kashian's opposition to Harriman's SLAPP motion dealt principally with the first cause of action for unfair competition. Kashian attached declarations by three individuals who had been involved in one way or another with Harriman's previous environmental lawsuits, as well as his own (Kashian's) declaration; evidentiary objections to Harriman's declaration in support of the motion; and a request the court take judicial notice of certain pleadings and other documents related to the earlier suits. He also challenged Harriman's claims of privilege.

In reply, Harriman argued the evidence proffered by Kashian did not support his unfair competition claim, and noted in any case that most of it related to events that had occurred outside the four-year statutory limitations period for such claims. He also submitted the declarations of three more individuals involved with the environmental organizations on whose behalf he had filed suit, and another declaration of his own. Kashian again filed written objections to the declarations.

In anticipation of a hearing on Harriman's SLAPP motion set for August 30, 2000, the court issued a tentative decision granting the motion as to all causes of action, on the ground Kashian had failed to establish he was likely to prevail if his claims went to trial. The hearing followed as scheduled, after which the court took the matter under submission. It issued a written order granting the motion on September 22, 2000.

### The Court's Order

The court concluded Harriman had met his initial burden of showing Kashian's action was subject to the anti-SLAPP statute, such that the burden then shifted to Kashian to establish a probability he would prevail if the

action were to go to trial. The court held Kashian had failed to meet this burden.[5]

As for the first cause of action for unfair competition, the court found the evidence failed to show that Valley Advocates and the other groups on whose behalf Harriman had filed environmental lawsuits were merely sham corporations he used to pursue meritless litigation for his own benefit. The court made no ruling about whether statements made in connection with the lawsuits were privileged.

As for the second cause of action for defamation (as a result of sending the letter to the Attorney General), the court concluded Harriman's statements were privileged under section 47, subdivision (b) of the Civil Code. The court declined to decide whether the privilege was a qualified one (in which case it could be defeated by a showing the statements were made with actual malice), or it was absolute (in which case it applies regardless of malice). This was so, the court explained, because the evidence failed to show Harriman had acted with malice in any event.[6]

And, as for the third cause of action for defamation (as a result of the Fresno Bee article), the court found the evidence failed to show it was Harriman who sent the letter to the newspaper. It also ruled Harriman's delivery of the letter to third persons (his clients, again presumably St. Agnes and LHCC) was privileged under Civil Code section 47, subdivision (c).

On November 9, 2000, Kashian filed a timely notice of appeal from the court's order granting Harriman's SLAPP motion. (See §§ 425.16, subd. (j), 904.1, subd. (a)(13); *Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 906-907 [84 Cal.Rptr.2d 303] [order granting or denying a special motion to strike under § 425.16 is appealable order].)

On November 30, the court granted Harriman's motion for costs and attorney fees in the amount of $7,296.15. Kashian appealed from this order,

---

[5]The court took judicial notice of the documents submitted by Kashian (consisting mostly of pleadings filed by Harriman in some of the environmental cases), but declined to take notice of the truth of any facts asserted in them. (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548 [8 Cal.Rptr.2d 552].) The court also noted Kashian's evidentiary objections, and stated it had considered only admissible evidence. (See *Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1419 [267 Cal.Rptr. 819]; but see *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 234-238 [114 Cal.Rptr.2d 151] [disagreeing with *Biljac*].)

[6]Apart from the question of privilege, the court concluded Kashian was a private figure for First Amendment purposes. Thus, but for the privilege, Kashian could have established his claim for defamation without having to prove Harriman acted with actual malice. (See *Mosesian v. McClatchy Newspapers* (1991) 233 Cal.App.3d 1685, 1697 [285 Cal.Rptr. 430].)

and Harriman cross-appealed. (See § 904.1, subd. (a)(2); *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 46 [269 Cal.Rptr. 228] [postjudgment order awarding costs and attorney fees is separately appealable].) We subsequently dismissed Harriman's cross-appeal.

## DISCUSSION

### I. *The Anti-SLAPP Statute*

The Legislature enacted section 425.16 in 1992 to provide a procedure by which a trial court can "dismiss at an early stage nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235 [83 Cal.Rptr.2d 677].) The statute, as subsequently amended, provides in part:

"(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly.

"(b)(1) *A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.*

"(2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. [¶] . . . [¶]

"(e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding

authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (Italics added.)

Thus, section 425.16 requires the trial court to undertake a two-step process in determining whether to grant a SLAPP motion. "First, the court decides whether the defendant has made a threshold prima facie showing that the defendant's acts, of which the plaintiff complains, were ones taken in furtherance of the defendant's constitutional rights of petition or free speech in connection with a public issue." (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1364 [102 Cal.Rptr.2d 864] (*Paul for Council*).)

If the court finds the defendant has made the requisite showing, the burden then shifts to the plaintiff to establish a "probability" of prevailing on the claim by making a prima facie showing of facts that would, if proved, support a judgment in the plaintiff's favor. (*Kyle v. Carmon, supra,* 71 Cal.App.4th at p. 907.) The court also considers the defendant's opposing evidence, but only to determine if it defeats the plaintiff's showing as a matter of law. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 867 [44 Cal.Rptr.2d 46].) That is, the court does not weigh the evidence or make credibility determinations. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 654 [49 Cal.Rptr.2d 620]; *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 827-828 [33 Cal.Rptr.2d 446].) Finally, in assessing the probability the plaintiff will prevail, the court considers only the evidence that would be admissible at trial. (*Church of Scientology v. Wollersheim, supra,* at pp. 654-655; *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497 [45 Cal.Rptr.2d 624].)

Whether section 425.16 applies, and whether the plaintiff has shown a probability of prevailing, are both questions we review independently on appeal. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625].)

■ Kashian, in his opening brief, concedes the first part of the two-step process by acknowledging the anti-SLAPP statute applies to all three causes of action stated in his complaint. However, on January 30, 2002, after briefing was complete, an opinion was filed in *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921 [116 Cal.Rptr.2d 187] (*Kajima*), in which the appellate court affirmed the trial court's order denying Kajima's SLAPP motion. The court concluded section

425.16 did not apply to the causes of action asserted in the city's cross-complaint, including several for unfair business practices. Kashian called *Kajima* to our attention and requested the opportunity to submit supplemental briefing on the question of whether the same must be said about his cause of action for unfair competition. We granted the request. After reviewing the case and the parties' briefs, we conclude the statute applies.

Kajima sued the city for breach of contract and other related causes of action, claiming it had not been paid for work performed on a construction project. The city cross-complained against Kajima for breach of contract and of the implied covenant of good faith and fair dealing in connection with Kajima's bidding and performance on the project. The city later filed an amended cross-complaint alleging 19 additional causes of action, including three for unfair business practices. Kajima moved to strike the amended cross-complaint under section 425.16, contending it was filed in retaliation for Kajima's exercise of its First Amendment right to petition for redress of grievances (i.e., for having filed the complaint against the city). The trial court initially granted the motion, but later reinstated the amended cross-complaint (except for one cause of action), and Kajima appealed. (*Kajima, supra*, 95 Cal.App.4th at pp. 924-926.)

As the appellate court noted, the moving defendant in a SLAPP action has the initial burden of showing the plaintiff's challenged cause of action *arose from* an act by the defendant in furtherance of its right of petition or free speech. (*Kajima, supra*, 95 Cal.App.4th at p. 928.) Notwithstanding Kajima's claim of retaliation, the court found the city's amended cross-complaint alleged causes of action "arising from Kajima's bidding and contracting practices [that had occurred prior to its lawsuit], not from acts in furtherance of its rights of petition or free speech." (*Id.* at p. 929.) The city's claims for unfair competition, for example, alleged Kajima had engaged in acts that included " 'intentional underbidding, bid-shopping, . . . [and] submission of false and inflated construction claims and change orders . . . ,' " none of which implicated the company's First Amendment rights. (*Id.* at p. 930.)[7]

In the present case, by contrast, Kashian's cause of action for unfair competition arose directly from Harriman's acts or statements, or alleged

[7]Kashian makes the following argument in reliance on *Kajima*. "In *Kajima*, the court held that the allegations of the complaint were not in furtherance of the cross-defendant's [Kajima's] right to petition the court or its free speech rights, but instead described the methods cross-defendant used to pursue its unfair business pattern and practice. Following the analysis of *Kajima* in the instant case, the allegations of the complaint arise from Harriman's unlawful and unethical practices and conduct in his practice of law, not from acts in furtherance or Harriman's right of petition or free speech. Filing sham lawsuits and cashing settlement checks without the authority of a client are not valid exercises of the right of petition or free speech—such allegations describe conduct that can subject an attorney to serious discipline or disbarment[.]"

acts or statements, made in connection with environmental litigation he was bringing on behalf of Valley Advocates and other organizations. Filing a lawsuit is an exercise of one's constitutional right of petition, and statements made in connection with or in preparation of litigation are subject to section 425.16. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 [81 Cal.Rptr.2d 471, 969 P.2d 564].)

For example, *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8 [43 Cal.Rptr.2d 350] involved a suit brought by the City of Barstow against Glen Ludwig, a developer, for unfair competition and other similar claims. The suit alleged that Ludwig, who hoped to build a shopping mall in competition with one planned within the city limits, had induced others to file meritless objections to the Barstow project, both judicial and administrative, in an effort to delay or defeat it. The trial court denied Ludwig's SLAPP motion, and he petitioned the appellate court for a writ of mandate directing the lower court to grant it. The court issued the writ. It concluded Ludwig's actions were communicative conduct protected under section 425.16 because they were taken " 'in connection with an issue under consideration or review by a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law. . . .' " (*Ludwig*, at p. 17, quoting § 425.16, subd. (e)(2).)

Several other decisions likewise have adopted a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16. The defendant in *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777 [54 Cal.Rptr.2d 830], an action for defamation, was a law firm conducting an investigation in anticipation of filing a complaint with the Attorney General. *Church of Scientology v. Wollersheim, supra*, 42 Cal.App.4th 628 involved an action to set aside a court judgment the defendant had received in a prior lawsuit. And *Wilcox v. Superior Court, supra*, 27 Cal.App.4th 809, a suit for defamation and restraint of trade, concerned statements made by the defendant in exhorting others to contribute to the cost of proposed litigation. In each case, the court held the statute applied. Similarly, we conclude Harriman's activities in connection with his

---

This argument begins by misstating what happened in *Kajima*. In fact, as we have just explained, the court actually held the causes of action in the city's *cross-complaint* did not *arise from* acts taken by Kajima in furtherance of its First Amendment rights. The court did *not* hold, contrary to what the rest of the argument would suggest, that (allegedly) unethical or illegal acts are not a "valid" exercise of these rights for purposes of applying the anti-SLAPP statute. We discuss this argument below in connection with Kashian's citation to *Paul for Council, supra*, 85 Cal.App.4th 1356.

Kashian makes a similar sort of argument with respect to the litigation privilege, i.e., that it does not protect allegedly illegal or unethical conduct. We likewise consider this argument below in connection with Kashian's citation to *Carney v. Rotkin, Schmerin & McIntyre* (1988) 206 Cal.App.3d 1513 [254 Cal.Rptr. 478].

previous environmental lawsuits are entitled to the protection of section 425.16.

The bulk of Kashian's supplemental brief concerns an issue having little to do with *Kajima*.[8] He contends section 425.16 does not apply to his complaint because the statute "does not protect illegal activity." He relies on *Paul for Council, supra*, 85 Cal.App.4th 1356. *Paul for Council* was a suit brought by Paul Christiansen following his defeat in a campaign for reelection to the city council. He alleged generally that the defendants had improperly influenced the election by making illegal campaign contributions to one of his opponents. The defendants, while acknowledging having laundered campaign money, moved under the anti-SLAPP statute to dismiss the suit on the basis their actions were constitutionally protected nonetheless. The court ruled the statute applied, such that the burden then shifted to Christiansen to establish a probability he would prevail at trial. He failed to make such a showing.[9] Therefore, the court granted the defendants' motion and dismissed the suit. Christiansen appealed.

The appellate court reversed. It noted the Legislature, in the preamble to section 425.16, expressed it's concern over " 'a disturbing increase in lawsuits brought primarily to chill the *valid* exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' " (*Paul for Council, supra*, 85 Cal.App.4th at p. 1363, quoting § 425.16, subd. (a).) It also noted, on the other hand, that the statute by its terms applies to "causes of action against a person 'arising from *any* act of that person in furtherance of the person's [constitutional rights]' " (*Paul for Council*, at p. 1366, quoting § 425.16, subd. (b)(1)), and defines such acts to include " '*any* written or oral statement or writing,' " or " '*any* other conduct' " (*Paul for Council*, at p. 1366, quoting § 425.16, subd. (e)(1)-(3) & (e)(4), respectively). The court concluded that, although it is "technically true" laundering campaign money is an act in furtherance of a protected right (to make campaign contributions), the Legislature could not have intended to include such illegal activity in the scope of section 425.16, i.e., money laundering is not a "valid" exercise of one's constitutional rights. (*Paul for Council, supra*, 85 Cal.App.4th at pp. 1366, 1367.)

Having just reached this conclusion, however, the court then noted its obvious limitations.

[8]The issue is therefore beyond the scope of our order granting permission to file supplemental briefing, as well as one that could have been raised earlier. We consider it only because it presents a question of law that does not require a lengthy discussion.

[9]Although it is not altogether clear from the opinion, it appears Christiansen may have stood on his claim the statute did not apply, and so made no attempt to show he was likely to prevail.

"In order to avoid any misunderstanding as to the basis for our conclusions, we should make one further point. This case, as we have emphasized, involves a factual context in which defendants have effectively conceded the illegal nature of their election campaign finance activities for which they claim constitutional protection. Thus, there was no dispute on the point and we have concluded, as a matter of law, that such activities are *not* a valid exercise of constitutional rights as contemplated by section 425.16. However, had there been a factual dispute as to the legality of defendants' actions, then we could not so easily have disposed of defendants' motion.

"As we have noted, a defendant need only make a prima facie showing that the plaintiff's suit arises 'from any act of [the defendant] in furtherance of [the defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue.' (§ 425.16, subd. (b)(1).) If the plaintiff contests this point, and unlike the case here, cannot demonstrate as a matter of law that the defendant's acts do not fall under section 425.16's protection, then the claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's burden to provide a prima facie showing of the merits of the plaintiff's case. As the court in *Wilcox* [*v. Superior Court, supra,* 27 Cal.App.4th 809] put it, this is an *additional* burden which the plaintiff must address. '[W]e believe this burden should be met in the same manner the plaintiff meets the burden of demonstrating the merits of its causes of action: by showing the defendant's purported constitutional defenses are not applicable to the case as a matter of law *or* by a prima facie showing of facts which, if accepted by the trier of fact, would negate such defenses.' (*Wilcox, supra,* 27 Cal.App.4th at p. 824, italics added.)" (*Paul for Council, supra,* 85 Cal.App.4th at p. 1367.)

This is just such a case, where the legality of Harriman's litigation activities is a matter of considerable dispute.[10] The burden thus shifted to Kashian to make a prima facie showing sufficient to establish a probability of prevailing. In short, conduct that would otherwise come within the scope

---

[10]Kashian also refers us to the recent case of *Lam v. Ngo* (2001) 91 Cal.App.4th 832 [111 Cal.Rptr.2d 582]. *Lam* was a tort action by a city councilman (Lam) stemming from a series of sometimes violent political demonstrations held outside his restaurant. Lam sued one of the people (Ngo) who had organized the demonstrations, as well as several unnamed Doe defendants who allegedly had committed acts of violence and intimidation. The appellate court reversed the trial court's order denying Ngo's SLAPP motion, finding there was no evidence he had authorized, directed, or ratified the violence. But it affirmed the order as to the Doe defendants, and remanded the case to permit Lam the opportunity to substitute the names of specific individuals who actually had been involved in the violence. That is, the court concluded Lam had established that *someone* had committed acts of political violence, which, the court held, were not protected by the First Amendment (and so were not subject to the anti-SLAPP statute). (*Lam,* at p. 851.)

of the anti-SLAPP statute does not lose its coverage (or, as we discuss below, the protection of the litigation privilege) simply because it is *alleged* to have been unlawful or unethical. If that were the test, the statute (and the privilege) would be meaningless.[11]

 We turn now to the second step of the SLAPP analysis. Kashian argues at some length that the evidence, and the inferences that reasonably might be drawn from it, are sufficient to establish a probability he would prevail if his complaint went to trial. In support of this argument, he urges us to examine the evidence with certain rules in mind. For example, he notes Harriman did not make any formal objections to his (Kashian's) evidence. On this basis, he argues Harriman waived any objections he might have had (*Sambrano v. City of San Diego, supra*, 94 Cal.App.4th at p. 236), and so the trial court was required to treat all his (Kashian's) otherwise objectionable evidence as competent and admissible (*Flood v. Simpson* (1975) 45 Cal.App.3d 644, 649 [119 Cal.Rptr. 675]). He contends we must do the same. Conversely, Kashian *did* object to much of Harriman's evidence. Kashian maintains he thereby preserved these objections, and reasserts many of them on appeal.

In a similar vein, Kashian also notes Harriman failed to specifically deny many of the assertions made in the declarations submitted by Kashian in opposition to the SLAPP motion, particularly those accusing Harriman of having engaged in a variety of deceptive litigation practices. Harriman's failure to deny the assertions, Kashian urges, should be deemed adoptive admissions to the effect the accusations are true. (See Evid. Code, § 1221; *People v. Silva* (1988) 45 Cal.3d 604, 623 [247 Cal.Rptr. 573, 754 P.2d 1070] [hearsay exception].)

In sum, Kashian contends the evidence, viewed in this way, is sufficient at least circumstantially to permit a trier of fact to find in his favor on all three causes of action against Harriman. We consider these contentions where appropriate, but first we briefly review the subject of privilege.

## II. *Privilege*

 Section 47 of the Civil Code provides, in part, that "[a] privileged publication or broadcast is one made: [¶] . . . [¶]

---

Kashian's point appears again to be that section 425.16 applies only to the *valid* exercise of one's First Amendment rights. But in *Lam*, as in *Paul for Council*, there was no question the acts underlying the SLAPP motion were illegal. The same is not true here.

[11]In still another new claim, Kashian contends Harriman could not invoke section 425.16 with respect to actions he took in furtherance of his *clients'* constitutional rights. The first cause of action for unfair competition, however, was founded on the allegation that Harriman had no real clients and was acting in his own interest in filing environmental lawsuits. It therefore implicated Harriman's exercise of his own right of free expression. (*Shekhter v. Financial Indemnity Co.* (2001) 89 Cal.App.4th 141, 152-153 [106 Cal.Rptr.2d 843].)

"(b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable [in a mandate action] . . . . [¶] . . . [¶]

"(c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information. . . ."

Subdivisions (b) and (c) of the statute create two different types of privilege. We emphasize this because Kashian, in arguing none of Harriman's actions were privileged, appears sometimes to confuse the two. Moreover, there are several different actions to which one or the other of the privileges arguably might apply: Harriman's environmental litigation activities (the first cause of action for unfair competition); his delivery of the May 22, 2000, letter to the Attorney General (the second cause of action for defamation); his delivery of the letter to his clients and possibly other "interested" parties (the third cause of action for defamation); and delivery of the letter by *someone* to the Fresno Bee (same).

Some of the confusion revolves around whether the applicable privilege is an absolute or a qualified one. ■ "California law recognizes two types of privileged communications—communications which are absolutely privileged and communications which are qualifiedly or conditionally privileged. If absolutely privileged, there is no liability even if the defamatory communication is made with actual malice. If the privilege is only conditional or qualified, a finding of malice will prevent the communication from being found privileged." (*Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 367 [76 Cal.Rptr.2d 670]; see also *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1206, fn. 12 [31 Cal.Rptr.2d 776, 875 P.2d 1279]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 498, 519, pp. 585, 609.)

### A. The Litigation Privilege

■ Civil Code section 47, subdivision (b) defines what is commonly known as the "litigation privilege." "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365].)

The litigation privilege is absolute; it applies, if at all, regardless whether the communication was made with malice or the intent to harm. (*Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1302 [100 Cal.Rptr.2d 437].) Put another way, application of the privilege does not depend on the publisher's "motives, morals, ethics or intent." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 220.) Although originally applied only to defamation actions, the privilege has been extended to *any* communication, not just a publication, having "some relation" to a judicial proceeding, and to *all* torts other than malicious prosecution. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1193-1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 29 [61 Cal.Rptr.2d 518].) Moreover, "[t]he litigation privilege is not limited to the courtroom, but encompasses actions by administrative bodies and quasi-judicial proceedings. [Citation.] The privilege extends beyond statements made in the proceedings, and includes statements made to initiate official action. [Citation.] [¶] . . . [¶] "[The] absolute privilege exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing. [Citation.] The privilege is based on '[t]he importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity.' [Citation.]" (*Wise v. Thrifty Payless, Inc., supra,* 83 Cal.App.4th at p. 1303 [holding privilege applies to husband's report to the Department of Motor Vehicles regarding wife's drug use and its possible impact on her ability to drive].)

If there is no dispute as to the operative facts, the applicability of the litigation privilege is a question of law. (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1139-1140 [57 Cal.Rptr.2d 284].) Any doubt about whether the privilege applies is resolved in favor of applying it. (*Adams v. Superior Court* (1992) 2 Cal.App.4th 521, 529 [3 Cal.Rptr.2d 49].)

■ Kashian argues on the strength of *Fenelon v. Superior Court* (1990) 223 Cal.App.3d 1476 [273 Cal.Rptr. 367], that Harriman's letter to the Attorney General was subject only to a "conditional litigation privilege" under Civil Code section 47, subdivision (b). We will address the merits of this contention later on in our discussion, but mention it here just to point out for the sake of clarity that there is no such thing. The issue in *Fenelon,* a defamation suit, was whether the defendant's knowingly false police report accusing the plaintiff of a crime was subject to the absolute litigation privilege in subdivision (b) (then subd. (2)), or the qualified "common interest" privilege in subdivision (c) (then subd. (3)). The court disagreed with an earlier decision in *Williams v. Taylor* (1982) 129 Cal.App.3d 745

[181 Cal.Rptr. 423], which had taken the former view, and held instead that only the qualified privilege applied. We discuss this privilege next.

### B. *The Common Interest Privilege*

■ Civil Code section 47, subdivision (c) codifies the common law privilege of common interest, "which protected communications made in good faith on a subject in which the speaker and hearer shared an interest or duty. This privilege applied to a narrow range of private interests. The interest protected was private or pecuniary; the relationship between the parties was close, e.g., a family, business, or organizational interest; and the request for information must have been in the course of the relationship." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 727 [257 Cal.Rptr. 708, 771 P.2d 406]; see also *Lunquist v. Reusser, supra,* 7 Cal.4th 1193.) Thus, the statute does not create a broad "public interest privilege" protecting publications by the news media to the general public regarding private persons, just because the publications pertain to matters of *general* public interest. (*Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 738.) "The word 'interested' as used in the statute refers to a more direct and immediate concern. That concern is something other than mere general or idle curiosity of the general readership of newspapers and magazines. One authority explains the statutory interest as follows: (1) The 'interest' applies to a defendant who 'is protecting his own pecuniary or proprietary interest.' (2) The required 'relation' between the parties to the communication is a contractual, business or similar relationship, such as 'between partners, corporate officers and members of incorporated associations,' or between 'union members [and] union officers.' (3) The 'request' referred to must have been in the course of a business or professional relationship. [Citation.]" (*Rancho La Costa, Inc. v. Superior Court* (1980) 106 Cal.App.3d 646, 664-665 [165 Cal.Rptr. 347].)

This definition is not exclusive, however, and the cases have taken an "eclectic approach" toward interpreting the statute. (*Institute of Athletic Motivation v. University of Illinois* (1980) 114 Cal.App.3d 1, 7 [170 Cal.Rptr. 411].) "The lesson we deduce from these cases is that the scope of the privilege under section 47, subdivision 3 [now subd. (c)] is not capable of precise or categorical definition, and that its application in a particular case depends upon an evaluation of the competing interests which defamation law and the privilege are designed to serve." (114 Cal.App.3d at p. 11.)

■ The common interest privilege is usually described as a qualified or conditional one, meaning it can be overcome by a showing of malice. But, "[t]his characterization is somewhat misleading. Section 47(3) [now § 47,

subd. (c)] *defines* a privileged communication as one made without malice. Thus, if malice is shown, the privilege is not merely overcome; it never arises in the first instance." (*Brown v. Kelly Broadcasting Co.*, *supra*, 48 Cal.3d at p. 723, fn. 7.) Malice for purposes of the statute means " 'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.' " (*Id.* at p. 723.) "[M]alice is not inferred from the communication." (Civ. Code, § 48.)

Application of the privilege involves a two-step analysis. The defendant has the initial burden of showing the allegedly defamatory statement was made on a privileged occasion, whereupon the burden shifts to the plaintiff to show the defendant made the statement with malice. (*Lundquist v. Reusser*, *supra*, 7 Cal.4th 1193.) The existence of the privilege is ordinarily a question of law for the court. (*Institute of Athletic Motivation v. University of Illinois*, *supra*, 114 Cal.App.3d at p. 13, fn. 5.)

With these definitions of the litigation and common interest privileges in mind, we now consider the three causes of actions asserted in Kashian's complaint to determine if one or the other of the privileges applies to them.

### First Cause of Action (Unfair Competition)

As we have already discussed, Kashian's unfair competition claim "arises from" Harriman's litigation activities, and so falls within the scope of the anti-SLAPP statute. (§ 425.16, subd. (e)(2).) For much the same reason, the claim concerns communications ordinarily protected by the litigation privilege. (See *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, *supra*, 47 Cal.App.4th at p. 784 [just as communications preparatory to seeking an investigation by the Attorney General are protected by the litigation privilege, they are also entitled to the benefits of the anti-SLAPP statute].) Nonetheless, Kashian contends the privilege does not apply for three reasons.

First, he argues Harriman's "practice of filing complaints with sham plaintiffs for the purpose of deceiving the target defendants" (fn. omitted) was conduct rather than speech. That is, while the anti-SLAPP statute applies to a cause of action arising from "any act" (i.e., conduct) of a person taken in furtherance of their right to petition or free speech (§ 425.16, subd. (b)(1)), the litigation privilege applies only to a "publication or broadcast" (i.e., speech) made in connection with an official proceeding (Civ. Code, § 47, subd. (b)). (See *Ludwig v. Superior Court*, *supra*, 37 Cal.App.4th at p. 19.)

Kashian relies on *Kimmel v. Goland* (1990) 51 Cal.3d 202 [271 Cal.Rptr. 191, 793 P.2d 524] (*Kimmel*). In *Kimmel*, residents of a mobilehome park sued the park's owners in a dispute over the residents' right to sell their mobilehomes. In anticipation of the suit, some of the residents surreptitiously taped their conversations with park personnel, without the latter's consent. When the owners learned of the tapes, they filed a cross-complaint against the residents, seeking damages for the illegal recording. (Pen. Code, §§ 632, 637.2.)[12] The residents moved for judgment on the pleadings on the ground their actions were protected by the litigation privilege. The trial court granted the motion, and the owners appealed. (*Kimmel, supra,* 51 Cal.3d at pp. 206-208.)

The appellate court reversed, and the Supreme Court affirmed the reversal. In so doing, the court distinguished between communicative and noncommunicative conduct. It explained the privilege would apply to a cause of action based on a communication or publication of the *content* of the illegal recording (if made in connection with litigation), but did not apply to the owners' claim for damages based on the *act* of recording itself. (*Kimmel, supra,* 51 Cal.3d at pp. 209-212.) "[O]ur holding that the litigation privilege does not apply is limited to the injury resulting from [the owners'] and [their attorney's] conduct. To the extent the complaint rests on [the attorney's] alleged communicative acts of 'counseling' and 'advising' his clients, the privilege is clearly operative." (*Id.* at p. 208, fn. 6; see also *Mero v. Sadoff* (1995) 31 Cal.App.4th 1466, 1480 [37 Cal.Rptr.2d 769] [doctor's negligence during examination preparatory to litigation not subject to privilege].)

Subsequent decisions have drawn this same distinction, and found the acts in question were a form of communicative conduct and thus absolutely protected by the litigation privilege. In *Rubin v. Green, supra,* 4 Cal.4th 1187, the owner of (still another) mobilehome park sued a resident and her attorney for assorted tort causes of action on the ground they were unlawfully soliciting other residents to join in an anticipated lawsuit against the owner. The residents later filed the suit, whereupon the owner amended his complaint to add an unfair competition cause of action for injunctive relief. The trial court sustained the residents' demurrer to the owner's amended complaint, ruling the residents' conduct was privileged under Civil Code section 47, subdivision (b). In reliance on *Kimmel,* the appellate court reversed because, among other reasons, it found the residents' conduct was primarily noncommunicative. (*Rubin v. Green, supra,* 4 Cal.4th at pp. 1191-1192.) The Supreme Court, in turn, reversed the appellate court and ordered the action dismissed. It concluded the defendants' alleged misrepresentations, whether or not they amounted to wrongful solicitation, "were communicative in their essential nature and therefore within the privilege of section

---

[12] Penal Code section 637.2, as then in effect, provided for a minimum recovery of $3,000 notwithstanding the existence of actual damages.

47(b)." (*Id.* at p. 1196.) And as we will discuss more fully below, the court also held the owner was not entitled to injunctive relief under the unfair competition statute for what was essentially the same conduct. (*Id.* at p. 1203.)

Likewise, in *Ludwig v. Superior Court, supra,* 37 Cal.App.4th 8, also an action for unfair business practices (see above), the court held the defendant's actions in recruiting and encouraging others to oppose a competing shopping center development, amounted to communicative conduct. "We are at a loss to imagine how Ludwig accomplished the recruiting and encouragement without communication." (*Id.* at p. 20.) It found the city's reliance on *Kimmel* for the contrary proposition "remarkably inapposite." (*Id.* at p. 18.)

In the case before us, Kashian argues Harriman filed meritless lawsuits on behalf of "sham plaintiffs" to deceive the defendants into believing the suits had more support than they did in fact. This alleged deception is essentially communicative conduct, even though it also may have involved noncommunicative acts. (*Rubin v. Green, supra,* 4 Cal.4th at p. 1195.)

Kashian's second argument against application of the litigation privilege is based on *Carney v. Rotkin, Schmerin & McIntyre, supra,* 206 Cal.App.3d 1513. In that case the defendant law firm was hired to collect a money judgment obtained by its client against Ms. Carney. Carney, an elderly widow, was unable to find transportation and so failed to appear at a court-ordered judgment-creditor examination. When she called to explain, the firm told her, falsely, that a bench warrant had been issued and would not be recalled unless she paid $1,000 toward her debt. Since she was unable to pay, Carney stayed in her apartment for several days expecting to be arrested. Once she discovered there was no warrant, she sued the law firm for negligent and intentional infliction of emotional distress, abuse of process, and unfair debt collection practices. The law firm demurred on the ground, among others, that its statements to Carney were absolutely privileged under Civil Code section 47, subdivision (2) (now subd. (b)). The trial court sustained the demurrer without leave to amend, and dismissed the action. Carney appealed.

The appellate court reversed. It concluded the privilege did not apply because the third prong of the four-prong test (see above) was lacking, i.e., the law firm's statements to Carney had not been made "to 'serve the purpose of litigation'" because they were not only false but also arguably a violation of section 6128 of the Business and Professions Code. (*Carney v. Rotkin, Schmerin & McIntyre, supra,* 206 Cal.App.3d at p. 1522.) Kashian

maintains the same is true here with respect to Harriman's statements made in connection with his environmental litigation (in that he claims they violated the same statute). However, the Supreme Court's subsequent decision in *Silberg v. Anderson, supra,* 50 Cal.3d 205 has raised a question about the continuing validity of *Carney.*

In reaching its conclusion, the *Carney* court relied on *Kinnamon v. Staitman & Snyder* (1977) 66 Cal.App.3d 893 [136 Cal.Rptr. 321], in which the court held a threatening and misleading letter sent by a law firm to its client's creditor, in violation of the rules of professional conduct, was not privileged because it did not serve the purpose of litigation. (*Id.* at pp. 896-897.) *Silberg* expressly disapproved *Kinnamon* and several other cases insofar as they utilized an "interest of justice" requirement, "either linguistically or substantively," as a condition for application of the litigation privilege. (*Silberg v. Anderson, supra,* 50 Cal.3d at pp. 217, 219.)[13] As the *Silberg* court explained, the "interest of justice" test had originally appeared in *Bradley v. Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818 [106 Cal.Rptr. 718], where "the court read into the requirement that the [privileged] communication be made 'to achieve the objects of the litigation' the additional requirement that the communication must have also been made for the purpose of promoting the 'interest of justice.' " (*Silberg, supra,* 50 Cal.3d at p. 217.) However, the Supreme Court said, "while the added moral consideration injected by the *Bradley* court may seem attractive, on further reflection it is seen to be a drastic departure from precedent and largely destructive of the principal purpose of the litigation privilege. It would permit derivative tort suits in many, if not most, cases on the ground that an

---

[13]*Silberg* arose from a dissolution proceeding in which the husband and wife agreed they and their children would undergo a psychological evaluation, to be performed by a mutually agreeable and independent psychologist, for the purpose of determining the appropriate visitation and child custody arrangements. The evaluation was performed by a psychologist (Adler) recommended by the wife's attorney (Anderson). The husband later sued Anderson, as well as his ex-wife and his own attorney, alleging Anderson had misrepresented to him that Adler was independent and neutral, when in fact Adler and Adler had a preexisting relationship, which relationship in turn had caused Adler's report to be biased against him (the husband).

The defendants demurred to the complaint on the ground Anderson's statements to the husband were absolutely privileged under Civil Code section 47, subdivision (2) (now subd. (b)). The trial court sustained the demurrer as to all causes of action without leave to amend, and dismissed the action. The appellate court affirmed the judgment of dismissal except as to the cause of action for "intentional tort." It concluded Anderson's representations were not privileged "if they were made to achieve personal objectives or to gain an advantage for her client through artifice or deceit, reasoning in that case they could not have been made to promote the 'interest of justice.' " (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 211.) It therefore remanded the matter to the trial court to permit the husband to amend the cause of action to allege Adler had acted with an " 'improper objective.' " (*Ibid.*) The Supreme Court granted review to determine whether the litigation privilege is subject to an "interest of justice" exception. (*Ibid.*)

otherwise privileged communication was not made for the purpose of promoting justice, a charge easily and quickly made by an adversary." (*Ibid.*)

The court went on to explain the "interest of justice" test "is wholly inconsistent with the numerous cases in which fraudulent communications or perjured testimony have nevertheless been held privileged." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 218.) It continued: "Obviously, such a test would also be contrary to the decisions in which liability for abuse of process is held precluded by the privilege. [Citations.] One of the two necessary elements of that tort is an ulterior purpose. [Citation.] Finally, endorsement of the 'interest of justice' requirement would be tantamount to the exclusion of *all* tortious publications from the privilege, because tortious conduct is invariably inimical to the 'interest of justice.' Thus, the exception would subsume the rule." (*Ibid.*)

The court recognized that strict application of the privilege to disallow derivative tort actions necessarily means some injuries will go uncompensated. But it said "[t]he salutary policy reasons for an absolute privilege supersede individual litigants' interests in recovering damages for injurious publications made during the course of judicial proceedings." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 218.) The court also noted that, in many of the decisions purporting to apply the "interest of justice" test, the court could have reached the same result (i.e., no privilege) based on the absence of one of the privilege's traditionally recognized elements. (*Id.* at pp. 217-218.) In addition, the court observed that remedies other than a derivative tort action will often exist, including, most notably, criminal prosecution under Business and Professions Code section 6128.[14] (*Silberg, supra,* 50 Cal.3d at pp. 218-219.) Finally, the court noted that "republications to nonparticipants in the [underlying] action are generally not privileged under section 47(2) [now § 47, subd. (b)], and are thus actionable unless privileged on some other basis." (*Silberg,* at p. 219.)

Referring back then to the four traditional elements required for application of the litigation privilege, the court effectively conflated the third and fourth. It said: "The [third] requirement that the communication be in furtherance of the objects of the litigation is, in essence, simply part of the [fourth] requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action. . . . The 'furtherance' requirement was never intended as a test of a participant's motives, morals, ethics or intent." (*Silberg v. Anderson, supra,* 50 Cal.3d at pp. 219-220.)

---

[14]Business and Professions Code section 6128 provides in relevant part: "Every attorney is guilty of a misdemeanor who . . . [¶] (a) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party."

The *Silberg* court overruled *Kinnamon* even though *Kinnamon* never specifically mentioned the "interest of justice" test. Thus, the court evidently concluded *Kinnamon* had applied the test sub silentio by taking account of the defendant's arguably unethical conduct to deny application of the litigation privilege. *Carney*, in turn, in reliance on *Kinnamon*, concluded the privilege did not apply because the defendant's conduct was not only unethical, but possibly a criminal violation of Business and Professions Code section 6128. (*Carney v. Rotkin, Schmerin & McIntyre, supra*, 206 Cal.App.3d at p. 1522.) This is the same statute Kashian contends Harriman violated. It is also one of the alternative remedies the court mentioned in *Silberg* in lieu of a derivative tort action barred by the litigation privilege. There would, of course, be no need to separately pursue this remedy if conduct violating the statute were, by definition, outside the litigation privilege.

We conclude from all this that communications made in connection with litigation do not necessarily fall outside the privilege simply because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal. This is assuming, of course, that the communications are "logically related" to the litigation. The communications in this case were not only related to the litigation, they *were* the litigation, or more accurately the pleadings in the litigation.

Cases applying the *Silberg* "logical relation" test do not lead us to a different result. In *Rothman v. Jackson, supra*, 49 Cal.App.4th 1134, for example, the court held the litigation privilege does not extend to "litigating in the press." (*Id.* at p. 1149.) It noted *Silberg*'s dictum that " 'republications to nonparticipants in the action are generally not privileged under section [47, subd. (b)].' " (*Id.* at p. 1143; see also *Susan A. v. County of Sonoma* (1991) 2 Cal.App.4th 88, 93-94 [3 Cal.Rptr.2d 27] [applying the rule to reach the same result].) The court in *Rothman* also restated the "logical relation" test this way: "[T]he 'connection or logical relation' which a communication must bear to litigation in order for the privilege to apply, is a *functional* connection. That is to say, the *communicative act* . . . must function as a necessary or useful step in the litigation process and must serve its purposes. This is a very different thing from saying that the communication's *content* need only be related in some way to the subject matter of the litigation . . . ." (*Rothman, supra*, 49 Cal.App.4th at p. 1146.)

And as for furthering "the objects of the litigation," the court said *Silberg*'s test "can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case." (*Rothman v. Jackson, supra*, 49 Cal.App.4th at p.

1148.) Notably, it then added: "A party's pleadings obviously satisfy this test." (*Ibid.*)

*Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140 [81 Cal.Rptr.2d 392] involved a prelitigation demand letter sent by one company (Proton) to another (Excelsior), accusing the latter of unfair competition for raiding Proton's employees. In addition, it accused Nguyen, a former Proton sales representative then working for Excelsior, of soliciting Proton's customers to switch their business to Excelsior. The letter went on: " 'We think you should be aware . . . ' " that Nguyen had been in prison " 'for repeatedly and violently assaulting his wife.' " (*Id.* at pp. 143-144.) (In fact, Nguyen had been in county jail for shooting at an unoccupied vehicle and vandalism.) Nguyen sued Proton for defamation and other related causes of action. The trial court granted Proton's motion for summary judgment on the ground Proton's statements were absolutely protected by the litigation privilege. Nguyen appealed, and the appellate court reversed.

The court concluded *Silberg* had significantly limited what was becoming a fairly expansive view of the "logical relation" test, and thereby brought the test more into line with several earlier decisions, including notably *Carney* and *Kinnamon* (cases disapproved expressly or inferentially by *Silberg* on other grounds as noted above). "We think these cases, and several others discussed earlier, establish an important point for both litigants and attorneys concerning prelitigation demands and the like. That point is that section 47(b) does not prop the barn door wide open for any and every sort of prelitigation charge or innuendo, especially concerning individuals." (*Nguyen v. Proton Technology Corp., supra*, 69 Cal.App.4th at p. 150.) Accordingly, the court said: "We have no difficulty in holding that the inclusion in [Proton's] demand letter to Excelsior of references to [Nguyen's] criminal record falls outside of the section 47(b) privilege." (*Id.* at p. 151.) This was so, it explained, partly because the information was incorrect, but more importantly because any connection between Nguyen's criminal record and Excelsior's alleged acts of unfair competition was "to be charitable about it, tenuous." (*Ibid.*)

While we question *Nguyen*'s reliance on *Carney* and *Kinnamon*, we do not quarrel with its conclusion. The decision fails, in any event, to support Kashian's contention that communicative conduct (alleged to be) in violation of Business and Professions Code section 6128 is outside the privilege because it does not further the object of litigation.

Kashian's third argument against application of the litigation privilege relies on *Rubin v. Green, supra*, 4 Cal.4th 1187. He states his position as

follows: "The California Supreme Court [in *Rubin*] has made clear that [a] violation of statutory constraints on attorney conduct *can be the basis of a cause of action for unfair competition* so long as the plaintiff bringing the suit is not an opposing party of the clients of the attorney defendant in related litigation." Kashian argues on this basis, since he was not a party to any of the environmental suits underlying the first cause of action, that the litigation privilege therefore does not apply to his unfair competition claim.

As explained above, *Rubin* was a suit for damages by the owner of a mobilehome park (Cedar Village) against a resident (Green) and her attorney, alleging they were unlawfully soliciting other residents to join an anticipated action against the owner for failing to maintain the park. When the residents later filed their failure-to-maintain action, the owner amended his suit to add an unfair competition claim under Business and Professions Code section 17200 et seq., seeking to enjoin the residents' alleged acts of harassment. The residents demurred to the amended complaint on the ground their conduct was privileged under Civil Code section 47, subdivision (b). The trial court sustained the demurrer and dismissed the owner's suit. The Court of Appeal reversed. The Supreme Court reversed the appellate court, holding the privilege applied to the tort causes of action for damages based on the defendants' alleged unlawful solicitation.

The court then considered whether the owner, notwithstanding the privilege, was entitled to pursue injunctive relief in light of the fact that Business and Professions Code section 17204 grants any member of the public standing to seek such relief against unfair competition. After concluding, in effect, that the defendants' conduct fell within the broad definition of unfair competition, the court sought to resolve the "evident conflict [between] the policy of permitting members of the public to police the spectrum of 'unfair competition' [and] the policy embodied in section 47(b) . . . of insuring litigants open access to the courts." (*Rubin v. Green, supra*, 4 Cal.4th at p. 1201.) The court cited several decisions in other contexts that had "rejected the claim that a plaintiff may, in effect, 'plead around' absolute barriers to relief by relabeling the nature of the action as one brought under the unfair competition statute." (*Ibid.*) It then concluded:

"That, in effect, is the result plaintiff seeks to achieve here. As noted, the conduct of defendants alleged in the complaint is clearly communicative and otherwise within the scope of section 47(b). It is thus absolutely immune from civil tort liability, including plaintiff's interference with contract and related claims. To permit the same communicative acts to be the subject of an injunctive relief proceeding brought by this same plaintiff under the unfair competition statute undermines that immunity. If the policies underlying section 47(b) are sufficiently strong to support an absolute privilege,

*the resulting immunity should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct as that protected by section 47(b).*

"We emphasize that the result we reach is propelled in part by the precise circumstances before us. Plaintiff is an adversary in the collateral failure-to-maintain action brought by the Cedar Village residents; the latter are represented in that action by the same attorneys who are defendants in this action; and defendant Green is one of the plaintiffs in that same action. Apart from spawning yet another layer of litigation, placing in the hands of a litigation adversary a weapon with the tactical potential of a statutory unfair competition claim for injunctive relief would promote all of the evils we have described above as accompanying retaliatory suits based on litigation-related communications. [Citation.]

"Permitting plaintiff to proceed would produce other distortions. In the typical derivative action filed in the wake of allegedly tortious litigation-related communications, the aggrieved plaintiff had been a party in the antecedent proceeding in which the challenged communications occurred, and now seeks redress for injuries alleged to have resulted from them. Unless the conditions requisite to a malicious prosecution action are pleaded and proven, section 47(b) denies relief in such circumstances, not only because that result is deemed necessary to secure the greater interest in ensuring unhindered access to the courts, but also because, as we noted in *Silberg, supra,* 50 Cal.3d 205, the original litigation itself provides an efficient forum in which to 'expos[e] during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result.' [Citation.]

"In short, permitting plaintiff's claim for injunctive relief here would upset the carefully constructed balance between 'the freedom of an individual to seek redress in the courts and the interest of a potential defendant in being free from unjustified litigation' [citation] by effectively destroying the availability of the privilege in any case in which a litigation adversary was prompted to claim that the conduct of the attorney for the opposite party constituted solicitation. Whatever the ultimate outcome of the ensuing unfair competition lawsuit, additional litigation will have been fomented and the presentation of potentially meritorious claims stifled.

"Our conclusion that plaintiff's tack of pleading his claim under the unfair competition statute does not override the litigation privilege in this case is

reinforced by the fact that the policy underlying the unfair competition statute can be vindicated by multiple parties other than plaintiff under the broad standing provision of Business and Professions Code section 17204. Apart from the overreached client, these litigants include the Attorney General, district attorneys, and certain city attorneys. (*Ibid.*) *Importantly, members of the public who, unlike plaintiff, are not adversaries in collateral litigation involving the same attorneys also have standing to pursue unfair competition claims under the statute.* (*Ibid.*) Finally, as noted, *ante,* both the State Bar and prosecutorial authorities are authorized to pursue additional sanctions against attorney solicitation of the sort alleged in the amended complaint.

"Given the importance of the policy favoring judicial access, and of the role played by the litigation privilege as a means of effectuating that policy, we conclude that plaintiff may not avoid the bar of section 47(b) by casting his claim as one for injunctive relief under the unfair competition statute." (*Rubin v. Green, supra,* 4 Cal.4th at pp. 1202-1204, italics added.)

The court's conclusion seems to lead to the anomalous result where the litigation privilege extends to an unfair competition claim against an attorney only when the claim is founded on the attorney's misconduct in earlier litigation against the plaintiff, at least if the privilege would also apply to bar a derivative tort action based on the same conduct. Or, as Justice Baxter observed in his dissent in *Rubin*: "Put in plain language, the result is that every member of the public—except for one, the victim—can seek injunctive relief" against an attorney's unlawful business practices under Business and Professions Code section 17200 et seq. (*Rubin v. Green, supra,* 4 Cal.4th at p. 1206 (dis. opn. of Baxter, J.).)

Here, Kashian was not a party to any of the environmental litigation that underlies his unfair competition claim against Harriman. Nor is the environmental litigation the subject of his two other causes of action for defamation. Thus, it appears Kashian is simply a member of the public for purposes of the first cause of action, which therefore is not foreclosed by the litigation privilege under *Rubin.* ▮ We must determine then whether Kashian has presented sufficient facts to establish a probability he would prevail if that cause of action were to go to trial.

Kashian alleged in his complaint that Harriman had a "pattern and practice" of filing groundless environmental lawsuits on behalf of one or both of two organizations—the Golden State Wildlife Federation and Valley Advocates—which he represented were separate entities with different members, when in fact they were the same "sham" corporation he had created to give

the appearance the suits enjoyed more support than was actually the case. Harriman's purpose, according to Kashian, was to induce the defendants to settle the suit for nuisance value, which settlement Harriman would often then keep for himself.

In support of these allegations (i.e., in opposition to Harriman's SLAPP motion), Kashian requested the court take judicial notice of the pleadings filed by Harriman in 10 different suits between 1992 and 1999, as well as documents from the Secretary of State relating to a corporation known at different times as the Golden State Wildlife Federation and Valley Advocates. In addition, he submitted the declarations of three people (Jerry Cook, Lydia Miller, and Patty Simpson) who had been involved in one way or another with one or more of the lawsuits.

The records from the Secretary of State indicate the California Natural Resources Federation was incorporated as a nonprofit public benefit corporation in 1988; that it changed its name in 1991 to the Golden State Wildlife Federation; and that it changed its name again in 1997 to Valley Advocates. That is, the three groups were the same corporation by different names, and thus no two of them coexisted contemporaneously *as the corporation.*

The statutory limitations period for an unfair competition claim is four years after the cause of action accrued. (Bus. & Prof. Code, § 17208.) Eight of the 10 lawsuits on which Kashian's claim is based were filed more than four years prior to the date Kashian filed the present complaint on June 19, 2000. Moreover, the Cook, Miller, and Simpson declarations all concerned events that took place in 1992 or before. Therefore, Kashian's first cause of action is time-barred insofar as it relies on this evidence.[15]

In the two remaining suits, filed in 1998 and 1999, Harriman appeared on behalf of Valley Advocates (and also on behalf of the Franklin Tract Landowners Association in one case). The pleadings identified Valley Advocates as a "California non-profit public benefit corporation" or simply as a "California non-profit corporation," which were both correct designations at the time.

In sum, assuming for present purposes that the allegations in Kashian's complaint, if true, were sufficient to make out a prima facie case of unfair

---

[15]These pleadings do not establish a pattern and practice of deceit in any event. In those cases brought on behalf of both the Golden State Wildlife Federation and Valley Advocates, the former is identified as a "California non-profit public benefit *corporation*" and the latter as a "California non-profit public interest *unincorporated association.*" In no case did the pleadings identify both groups as corporations. In the one case brought on behalf of Valley Advocates alone (in 1992), the group is identified as a "California non-profit public interest *organization.*" These designations are not in conflict with the corporation records submitted by Kashian in opposition to the SLAPP motion.

competition, the evidence he submitted in their support does not bear them out. Consequently, he has failed to meet his burden under the anti-SLAPP statute to establish a probability of prevailing on the first cause of action.

### *Second Cause of Action (Defamation)*

 Both Kashian's second and third causes of action for defamation are based on the letter Harriman wrote to the Attorney General on May 22, 2000. The second cause of action concerns delivery of the letter to the Attorney General's office; the third concerns its delivery to the Fresno Bee. We do not consider whether the letter was defamatory, or whether Kashian is a "public figure" for purposes of defamation law, but turn instead to the question of whether the delivery in either or both cases was privileged.

As noted above, Kashian argues Harriman's delivery of the letter to the Attorney General's office was subject only to the "conditional litigation privilege," by which we understand him to mean the qualified "common interest" privilege in Civil Code section 47, subdivision (c). He relies on *Fenelon v. Superior Court, supra,* 223 Cal.App.3d 1476, in which the court held the defendant's filing of a knowingly false police report accusing the plaintiff of a crime was subject only to the qualified common interest privilege rather than the absolute litigation privilege. The court reasoned an investigation of the sort that would be prompted by a police report is not an "official proceeding" within the meaning of Civil Code section 47, subdivision (b)(3) because it lacks the characteristics of a judicial inquiry. (*Fenelon, supra,* 223 Cal.App.3d at pp. 1480-1481.) In reaching this result, the court disagreed with *Williams v. Taylor, supra,* 129 Cal.App.3d 745, where the court said: "Section 47, subdivision [(b)], provides for an absolute privilege with regard to statements made 'in any . . . official proceeding authorized by law.' In our view, a communication concerning possible wrongdoing, made to an official governmental agency such as a local police department, and which communication is designed to prompt action by that entity, is as much a part of an 'official proceeding' as a communication made after an official investigation has commenced. [Citation.] After all, '[t]he policy underlying the privilege is to assure utmost freedom of communication between citizens and public authorities whose responsibility it is to investigate and remedy wrongdoing.' [Citation.] In order for such investigation to be effective, 'there must be an open channel of communication by which citizens can call his attention to suspected wrongdoing. That channel would quickly close if its use subjected the user to a risk of liability for libel. A qualified privilege is inadequate under the circumstances . . . . [¶] The importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity outweighs the occasional harm that might befall a defamed individual. Thus the absolute

privilege is essential.' [Citation.] And, since the privilege provided by section 47, subdivision [(b)], is absolute, it cannot be defeated by a showing of malice. [Citation.]" (*Williams, supra,* 129 Cal.App.3d at pp. 753-754.)

The majority, if not all, of the cases that have addressed this issue since *Fenelon* have concluded *Williams* represents the better view. (See, e.g., *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 494-496 [100 Cal.Rptr.2d 905]; *Devis v. Bank of America* (1998) 65 Cal.App.4th 1002, 1007-1008 [77 Cal.Rptr.2d 238]; *Passman v. Torkan* (1995) 34 Cal.App.4th 607, 616-619 [40 Cal.Rptr.2d 291]; *Hunsucker v. Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1502-1504 [28 Cal.Rptr.2d 722].) We agree.

The circumstances in *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman, supra,* 47 Cal.App.4th 777 were similar in many respects to those here. Dove Audio produced a recording featuring the voices of several celebrities, whose royalties were to be paid to their designated charities. When few royalty payments were actually made, the son of one of the celebrities (who had died in the interim) contacted the law firm of Rosenfeld, Meyer & Susman (RM&S) to request that it look into the matter and contact the appropriate government agency to conduct an investigation. RM&S wrote to the other celebrities explaining the situation and soliciting their support for a complaint it intended to file with the Attorney General's office. Dove Audio sued RM&S and others, alleging the letter was defamatory and interfered with their economic relationships with other celebrities. RM&S demurred to the complaint on the ground both causes of action were absolutely privileged under Civil Code section 47, subdivision (b). It also filed a SLAPP motion. The court sustained the demurrer without leave to amend, granted the motion, and dismissed the case. Dove Audio appealed.

The appellate court held the privilege extends to communications between private parties preliminary to the institution of an official proceeding. (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman, supra,* 47 Cal.App.4th at pp. 781, 783.) And it rejected an argument similar to the one adopted in *Fenelon* that neither a petition to nor an investigation by the Attorney General constitutes an "official proceeding" within the meaning of Civil Code section 47, subdivision (b). (47 Cal.App.4th at p. 782.) In this latter connection, the court observed that a communication *to* the Attorney General would have been privileged in view of the fact the Attorney General has, among other things, the statutory responsibility under Government Code section 12598 to protect the assets of charitable trusts and public benefits corporations (such as are involved here). (47 Cal.App.4th at pp. 782-783.)

We conclude on this basis that Harriman's delivery of his letter to the Attorney General was absolutely privileged. Consequently, Kashian could not have prevailed on his second cause of action.

*Third Cause of Action (Defamation)*

Kashian's third cause of action was based on the following allegations:

"25. Based on information and belief Mr. Kashian alleges that Defendants deliberately and with actual malice, published these false statements [contained in the letter] by sending or causing to be sent a copy of the letter to the Fresno Bee . . . .

"26. Based on information and belief Mr. Kashian alleges that . . . Defendants and each of them deliberately published these false statements to additional persons unknown, including the media, by sending or causing to be sent a copy of the letter to such persons.

"27. By thus intentionally and maliciously publishing the Letter's false factual statements and allegations to the Fresno Bee, Defendants and each of them deliberately caused the Fresno Bee to publish these false factual statements to the public at large . . . ."

Harriman, in his declaration in support of the SLAPP motion, denied publishing his letter to the Fresno Bee. He asserted that "at no time did I provide a copy of the letter, or of its contents, nor did I arrange for the letter to be conveyed, to the Fresno Bee." He did, however, acknowledge sending the letter to his clients and others: "I did send copies of the letter to my clients. And because we shared a common interest in the possibility of an investigation by the Attorney General, I also sent copies of the letter to representatives of the other two organizations whose requests for an investigation we were joining."

These other two organizations, according to the letter, were St. Agnes and LHCC. In his opposition to the motion, Kashian sought leave to amend the complaint to allege Harriman had published the letter to these two organizations by name. The court denied the motion.

■ On appeal, Kashian argues neither the litigation privilege nor the common interest privilege attaches to publication of the letter to the Fresno Bee, or to its publication to St. Agnes and LHCC. We address these contentions in turn.

As for the publication of the letter to the Fresno Bee, we do not reach the question of privilege because we agree with the trial court's conclusion Kashian failed to make a sufficient prima facie showing Harriman was the person responsible for sending the letter to the newspaper. Kashian argues:

"The fact that The Fresno Bee published portions of the Letter verbatim is circumstantial evidence that someone republished the Letter to The Fresno Bee. The fact that Mr. Harriman wrote the Letter and republished it to third parties is circumstantial evidence that he or one of his agents is the 'someone' who republished the Letter to The Fresno Bee." We disagree with the second part of this proposition. While it may be reasonable to infer the letter was delivered to the Fresno Bee by one of the four people to whom Harriman had sent a copy (not including the Attorney General), it does not follow that this person was acting as Harriman's "agent," or that Harriman knew or intended this result.

Kashian's citation to *Copp v. Paxton* (1996) 45 Cal.App.4th 829 [52 Cal.Rptr.2d 831] is unavailing. Paxton was a county official whose responsibilities included emergency planning, and Copp was a private citizen who held himself to be an expert in earthquake safety. The two men had an ongoing disagreement about the best way to protect schoolchildren in an earthquake. In the course of his duties, Paxton wrote a staff memorandum and two letters that were critical of Copp, one to a colleague (Eisner) and another to a private citizen (Johnson) who had expressed concerns about a conference Copp was planning. All three documents later made their way somehow to the conference's sponsors. The sponsors withdrew their support, and the conference was cancelled. Copp sued Paxton and others on several grounds, including defamation. The trial court granted Paxton's motion for summary judgment on the basis all the communications were subject to the "executive officer" privilege under Civil Code section 47, subdivision (a) (protecting publications made "[i]n the proper discharge of an official duty"). Copp appealed.

The appellate court concluded the executive officer privilege did not extend to the republication of the staff memorandum (which contained one sentence it determined was defamatory) to the conference sponsors. (*Copp v. Paxton, supra,* 45 Cal.App.4th at p. 844.) The court also found it was reasonable under the circumstances to infer Paxton had caused the memorandum to be republished by enclosing it in his letter to Johnson. (*Ibid.*) However, the court then decided Copp was a "limited purpose public figure" for purposes of his defamation claim, such that he would be required to prove Paxton had republished the memo with actual malice. (*Id.* at p. 846.) The court held the evidence was insufficient in this regard. "[W]hile the trier of fact could reasonably infer that the staff memorandum was probably enclosed with the Johnson letter, it is by no means certain that it reached the conference sponsors by this route and, if it did, the actual circumstances surrounding the enclosure of the document are obscure. . . . [¶] . . . [The inference that Paxton sent the memorandum to Johnson] only provides a

basis for speculation that he [Paxton] entertained a serious doubt as to the truth of the [defamatory] sentence." (*Id.* at p. 847.)

The circumstances in *Copp* giving rise to the inference Paxton was responsible for republishing the staff memorandum differ from those in the present case in two important respects. In *Copp*, Paxton was the only person in possession of all three of the documents that were turned over to the conference sponsors, and so was their likely source. Further, since Johnson had expressed concerns about the conference, Paxton knew or should have known he would probably pass on whatever documents Paxton sent him. In this case by contrast, Harriman was only one of at least five people who had a copy of the letter. And there is no reason suggested by the evidence for Harriman to believe one of the others to whom he sent the letter would forward it to the newspaper.

We turn finally to Harriman's publication of the letter to St. Agnes and LHCC. As we have explained above, communications made between private parties preparatory to or in connection with an "official proceeding" are absolutely privileged under Civil Code section 47, subdivision (b)(3). (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman, supra,* 47 Cal.App.4th at p. 781.) Moreover, an "official proceeding" includes a complaint to or a resulting investigation by the Attorney General. (*Id.* at pp. 782-783.) In this case, St. Agnes and LHCC both were parties to the request to the Attorney General for an investigation into Community's tax-exempt status. It follows that their communications with one another in that connection were protected by the litigation privilege.

Kashian maintains the same privilege does not extend to their communications in regard to Harriman's request for an investigation into Kashian's alleged conflict of interest, a request in which neither St. Agnes nor LHCC had joined (at least at that time). But we need not decide this point because we conclude the common interest privilege applies. It is apparent from the letter itself that the two subjects (Community's business practices and Kashian's potential conflict) were sufficiently interrelated that the parties to the two requests shared a common business or professional interest in them. We, like the trial court, believe this is enough in any event to shift the burden to Kashian to show Harriman's delivery of the letter to St. Agnes and LHCC was prompted by " 'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.' " (*Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 723; see also *Lundquist v. Reusser, supra,* 7 Cal.4th 1193, 1210-1211 [once defendant establishes

defamatory statement was made on a privileged occasion, plaintiff bears the burden of proving defendant acted with malice].)[16]

Kashian argues simply that he "presented evidence that, if believed, was sufficient to support a finding of actual malice, which would prevent the defense of a conditional privilege from arising." But he neglects to identify just what this evidence is. Instead, he relies again on a series of speculative inferences. On the premise Harriman's statements about him in the letter are both defamatory and demonstrably false, Kashian contends a jury reasonably might infer Harriman acted with malice because he failed to conduct an adequate investigation before making the statements; because he reaffirmed (in his SLAPP motion) his belief the statements were true even after Kashian (in his complaint) denied them; and because Harriman was untruthful in regard to other (unspecified) matters.

■ Malice may be established by showing the publisher of a defamatory statement lacked reasonable grounds to believe the statement was true, and therefore acted with a reckless disregard for the rights of the person defamed. (*Cuenca v. Safeway San Francisco Employees Fed. Credit Union* (1986) 180 Cal.App.3d 985, 997 [225 Cal.Rptr. 852].) However, negligence is not malice. (*Cabanas v. Gloodt Associates* (E.D.Cal. 1996) 942 F.Supp 1295, 1301.) "It is not sufficient to show that the statements . . . were inaccurate, or even unreasonable. Only willful falsity or recklessness will suffice. 'It is only when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a wilful disregard for or avoidance of accuracy, that malice is shown.' " (*Id.* at pp. 1301-1302, quoting *Roemer v. Retail Credit Co.* (1970) 3 Cal.App.3d 368, 372 [83 Cal.Rptr. 540].)

■ Statements that are otherwise privileged nonetheless may be used in some circumstances to prove the speaker's state of mind. (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168 [232 Cal.Rptr. 567, 728 P.2d 1202].) "[W]hile section 47(2)

---

[16]The heading to the section of Kashian's opening brief dealing with this part of the analysis asserts: "Defendants failed to establish, as a matter of law . . . that Mr. Harriman republished the letter to third persons without malice." Elsewhere, he says: "Mr. Harriman cited no authority to establish that he acted without malice . . . ." Plainly, it was not Harriman's burden to make such a showing.

Conversely, Kashian is correct that he had no responsibility to prove the allegedly defamatory statements were *not* made on a privileged occasion. That is, the trial court concluded the statements were subject to the common interest privilege in part because: "Plaintiff [Kashian] has failed to show that the communication to the third party [St. Agnes and LHCC] was not privileged. There is no evidence to show that there was no common interest." However, although we disagree with this part of the court's rationale, we conclude for reasons we explain below that its result was correct.

[(now § 47, subd. (b))] bars certain tort causes of action which are predicated on a judicial statement or publication itself, the section does not create an evidentiary privilege for such statements. Accordingly, when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding may be used for evidentiary purposes in determining whether the individual acted with the requisite intent. [Citations.]" (*Ibid.*)

 Kashian's bare assertion that many of the statements in Harriman's letter are false does not make it so, much less establish that Harriman made the statements maliciously. For example, Harriman urged the Attorney General to investigate certain of Kashian's business dealings with Community, as follows: "What your investigator(s) will need to do is to obtain property profiles on certain properties, such as the proposed Heart Hospital and Women's Center, in order to trace the ownership and development of the properties with and/or by entities in which Mr. Kashian and/or his partners have been involved, either directly or indirectly, through such entities as 'Federal Properties' and/or the 'Bombay Company, Inc.' "

In his declaration in opposition to Harriman's SLAPP motion, Kashian responded in part: "The Harriman allegations implying that I own or have an ownership interest in two companies known as 'Federal Properties' and [']Bombay Company, Inc.' are good examples of Harriman's completely groundless claims. I have no interest in either of the two companies if, indeed, such companies actually exist anywhere other than in the mind of Richard Harriman. Even a cursory review of the true facts would have put anyone, including Richard Harriman, on notice that many of the factual allegations in the letter are false. For example, it is a matter of public record that the property purchased by the Fresno Heart Hospital—which Harriman accused me of profiting from—was sold by River Park Properties approximately 10 years prior to the Heart Hospital's purchase. Neither I nor River Park Properties nor any other entities in which I held any interest had any financial stake in that land sale, and this was made clear in an article which appeared in the Fresno Bee a few days after excerpts from Harriman's letter to the Attorney General were published." The Fresno Bee article that appeared on June 1, 2000, simply reported that "[t]he property purchased by Community [for the heart hospital] was not owned by Kashian."

This evidence tends to show at most that Harriman's letter was inaccurate insofar as it suggested Kashian may have had a direct financial interest in Community's purchase of land for a heart hospital. On the other hand, it appears to substantiate the suggestion that Kashian had previously "acquired, developed, owned, and/or sold" the land through one or another of the

business entities with which he was involved. We do not believe in any case the evidence is sufficient to support an inference Harriman acted with "a reckless or wanton disregard for the truth" when he wrote the letter. (*Roemer v. Retail Credit Co., supra,* 3 Cal.App.3d at p. 372.) Consequently, Kashian has failed to meet his burden of establishing a probability he would prevail at trial on the third cause of action.

### Costs and Attorney Fees

The trial court awarded Harriman his costs and attorney fees pursuant to section 425.16, subdivision (c), which provides in part: "In any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." Since we will affirm the court's order granting Harriman's SLAPP motion, it follows we must also affirm the fee award.

Section 425.16, subdivision (c) also entitles Harriman to recover his costs and attorney fees on appeal. (*Evans v. Unkow, supra,* 38 Cal.App.4th at pp. 1499-1500.)

### DISPOSITION

The judgment is affirmed. Costs are awarded to respondents.

Vartabedian, Acting P. J., and Wiseman, J., concurred.