63 Cal.Rptr.3d 129 (2007)
153 Cal.App.4th 499
MIDLAND PACIFIC BUILDING CORPORATION, Plaintiff and Respondent,
v.
John E. KING et al., Defendants and Appellants.
No. B192017.
Court of Appeal of California, Second District, Division Six.
July 18, 2007.
*131 Manatt, Phelps & Phillips, Michael M. Berger, Lara M. Krieger, Los Angeles; and William S. Walter, Oakland, for Defendants and Appellants.
Adamski Moroski Madden & Green, Thomas D. Green, Avila Beach, Raymond A. Biering, San Luis Obispo; Brown, Winfield & Canzoneri and Thomas F. Winfield III, Los Angeles, for Plaintiff and Respondent.
*130 GILBERT, P.J.
"The paradigm SLAPP is a suit filed by a large land developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans. [Citations.]" (Wilcox v. Superior Court (1994) 27 Cal.App.4th 809, 815, 33 Cal.Rptr.2d 446, disapproved on another ground by Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 68, fn. 5, 124 Cal.Rptr.2d 507, 52 P.3d 685.)[1] Paradigms change. Here we conclude plaintiff developer brought its lawsuit to vindicate "a legally cognizable right," not "to obtain an economic advantage" over the defendants. (Id. at p. 816, 33 Cal. Rptr.2d 446.)
Plaintiffs action is for breach of contract and fraud. Defendants file an anti-SLAPP motion. (Code Civ. Proa, § 425.16.)[2] They claim the lawsuit arises from the exercise of their constitutional rights of free speech and petition in processing a tract map. The trial court denies the motion.
We conclude that the lawsuit does arise from protected activity, but the trial court properly denied the motion. Plaintiff showed a probability of prevailing on its claim. We affirm.

FACTS

Contract
John and Carole King own 27 acres in San Luis Obispo County. The property is within the city of San Luis Obispo's (City) sphere of influence, and is subject to a specific plan adopted by the City.
In February of 2003, the Kings entered into a written contract to sell their property to Midland Building Corporation (Midland). Midland agreed to pay $125,000 for each "market rate lot." "Market rate lot" is defined in the contract as a single family residential lot that is: (a) in substantial conformance with the draft specific plan and the draft vesting tentative tract map dated May 2001; (b) approved by the City as part of a vesting tentative tract map; and (c) not subject to requirements, restrictions or limitations related to affordable housing. The parties estimated that there would be 120 market rate lots, but acknowledged that the actual number may be more or less.
The Kings agreed to obtain approval of a specific plan and vesting tentative tract map in substantial conformance with the draft specific plan and draft tentative tract map at their expense.
As part of the purchase price, Midland agreed on execution of the contract to lend the Kings $1 million secured by the property, and to pay the Kings $15,000 per month to be applied to existing loans secured by the property until close of escrow.
*132 Escrow would close when the Kings obtained all entitlements and approvals necessary for the construction of a subdivision in substantial conformance with the draft specific plan and draft vesting tentative tract map.

Complaint
All did not go as planned. Midland filed this action against the Kings in February of 2006. Midland's first amended complaint alleges as follows:
In 2005, the Kings told Midland that the City demanded a reconfiguration of the tentative map to accommodate additional affordable housing. The reconfiguration would increase the number of detached single family residential lots to approximately 140. Midland agreed that the reconfiguration would be in substantial conformance with the draft tract map referred to in the contract. The reconfigured map is referred to as the "Amended Draft Tract Map."
In January of 2006, the Kings spoke with Midland's vice-president, Reed Harris. John King told Harris that the cost to obtain subdivision map approval was more than he had anticipated.[3] In addition, the value of the property had increased since the contract was signed. King told Harris that Midland should agree to an increase of $35,000 per lot. If Midland did not agree, King threatened to withdraw the Amended Draft Tract Map, which Midland had approved, and submit a new map to the City. The new map would dramatically increase the density of the project and substantially decrease the size of many lots. A few days later, King repeated this to Midland's president, Dennis Moresco.
On January 23, 2006, Midland's counsel wrote to the Kings rejecting the plan, and insisting that the Kings perform as provided in the contract.
On January 25, 2006, the City's planning commission considered the tentative map for the property. The map before the commission was the 140-lot Amended Draft Tract Map approved by Midland. City staff recommended approval of that map. But for the first time, the Kings presented a new tentative tract map at the hearing. The new map showed 80 lots around the perimeter of the Kings' property, but no lots in the interior. The Kings told the commission they planned to return later and seek approval of a much higher density development in the interior. The complaint refers to the new map as the "High Density Tract Map."
At the same hearing, the planning commission considered tentative subdivision maps for two properties adjacent to the Kings' property. By agreement between the City and the three applicants, the tentative maps for the three properties were being processed concurrently. The residential density of the maps for the adjacent properties is consistent with the density shown on the Amended Draft Tract Map. The commission approved the maps for the adjacent properties with no change in density.
On March 7, 2006, the city council considered the subdivision application for the Kings' property. It voted to have the High Density Tract Map returned to the planning commission for further review. At the hearing, the Kings' representative said the Kings would submit a new map that will include approximately 190 lots. Such a map will not substantially comply *133 with the 140-lot Amended Draft Tract Map approved by Midland.

Anti-SLAPP Motion
The Kings responded to the complaint by filing an anti-SLAPP motion. In support of the motion, they submitted an affidavit by David Watson, the Kings' director of planning and project development. Watson declared the Kings' project had to be changed in order to be consistent with the City's recently enacted housing element and the specific plan for the area. The adopted specific plan is different from the draft plan. It requires higher densities, multiple housing types, affordable housing, area-wide drainage improvements, and other major infrastructure improvements to be constructed at the owner's expense. In response to the City's concerns, the Kings presented a revised map and plan to advance the City's "`affordable-by-design' " housing element goals. The revised map was unanimously endorsed by the planning commission, and the city council unanimously supported the revised design.
Midland submitted the declaration of Reed Harris, its vice-president, in opposition to the motion. Harris declared that until January 17, 2006, the Kings advised him they were processing a map for 140 lots. On January 17, 2006, Harris heard a rumor that the Kings were going to submit a map having a substantially higher density. The next day, Harris called the City's deputy development director, Michael Draze. Draze told Harris the City was not requiring increased density, but if the developer volunteered, the City would consider it.
Harris further declared that he spoke to John King on January 18, after speaking with Draze. Harris asked King whether he was increasing the project density. King responded that the project had taken longer and cost more than he had anticipated and that the land had significantly increased in value. King said "he felt" Midland should increase the purchase price by $35,000 per lot. King said he would have to do something unless he talked to Midland's president, Dennis Moresco, soon.
Harris declared that he attended the planning commission meeting on January 25, 2006. The commission agenda showed the 140-lot Amended Draft Tract Map would be considered. The staff report recommended approval of that map. At the meeting, the Kings showed the commission the new High Density Tract Map. The commission approved the new map. Harris had never seen the map before the hearing.
Moresco, Midland's president, declared: Midland loaned the Kings $1 million and made $15,000 monthly payments as required by the contract. Shortly before the planning commission meeting, Moresco received a telephone call from John King. King told him that unless he agreed to pay an additional $4 million, he would submit a high density map to the City. Moresco refused to pay King more. Moresco had never seen the High Density Tract Map prior to the planning commission hearing.
Watson, the Kings' director of planning, declared in rebuttal that Harris attended meetings with the City, and knew the City was refusing to process maps that did not meet minimum standards for density. John King declared he asked that Midland "recognize" his project costs had increased by $5 million, but made no threat or demand for any payment as a condition for processing the project.

DISCUSSION

I
Section 456.16 establishes a procedure for bringing a special motion to strike *134 lawsuits that are brought primarily to "chill" the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. (Id. at subd. (a); Kibler v. Northern Inyo County Local Hosp. Dist. (2006) 39 Cal.4th 192, 197, 46 Cal.Rptr.3d 41, 138 P.3d 193.)
Section 425.16, subdivision (b)(1), provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."
An "`act in furtherance of a person's right of petition or free speech ...'" includes any written or oral statement made before a legislative, executive, or judicial body, or any other official proceeding authorized by law, or in connection with an issue under consideration by such body or in such proceeding. (§ 425.16, subd. (e)(1) & (2).) The moving party need not separately demonstrate that such an oral or written statement concerns an issue of public significance. (Briggs v. Eden Council for Hope and Opportunity (1999) 19 Cal.4th 1106, 1123, 81 Cal. Rptr.2d 471, 969 P.2d 564.)
Section 425.16 requires the trial court to undertake a two-step process. (Kashian v. Harriman (2002) 98 Cal. App.4th 892, 906, 120 Cal.Rptr.2d 576 (Kashian).) First, the court must decide whether the defendant has made a prima facie showing that the acts of which the plaintiff complains were taken in furtherance of the defendant's rights of petition or free speech. (Ibid.) If the defendant carries that burden, the burden shifts to the plaintiff to show a probability of prevailing on the claim. (Ibid.) The plaintiff can carry his burden by making a prima facie showing of facts that would, if proved, support a judgment in his favor. (Ibid.) The court's consideration of the defendant's evidence is limited to determining whether it defeats the plaintiffs showing as a matter of law. (Ibid.) The trial court does not weigh the evidence or make credibility determinations. (Ibid.)
Finally, both steps of the process are subject to our independent review on appeal. (Kashian, supra, 98 Cal.App.4th at p. 906, 120 Cal.Rptr.2d 576.)

II
The Kings contend they have carried their burden of a-prima facie showing that the acts of which Midland complains were taken in furtherance of their rights of petition and free speech.
The Kings argue it is undisputed the action arose from their presentation of the High Density Tract Map to the City. The Kings conclude their acts are within section 425.16, subdivision (e)(1) and (2), statements made before a legislative body or in an official proceeding, or made in connection with an issue under consideration by such body or in such proceeding.
The trial court determined the statute was not intended to protect purely business transactions. The court concluded that because the complaint arises out of an alleged breach of contract, the Kings have not succeeded in showing the action arises from protected activity.
The trial court relied on Ericsson GE Mobile Communications, Inc. v. C.S.I. Telecommunications Engineers (1996) 49 Cal.App.4th 1591, 57 Cal.Rptr.2d 491 (Ericsson). There, in determining the anti-SLAPP statute does not apply to a cause of action for intentional interference with economic advantage, the court stated: *135 "[I]n determining whether a cause of action falls within the scope of the statute, we hold that the Legislature intended to include only those suits that are based upon acts that are primarily in furtherance of a person's constitutional right of free speech, i.e., acts which advance or promote that right. For it is only in those cases where the party acted for the purpose of promoting or advancing his or her right of free speech, in contrast to one where the parties are performing or breaching their contractual obligations, that the right could be chilled by the specter of an unfounded lawsuit." (Id. at p. 1601, 57 Cal. Rptr.2d 491.)
But our Supreme Court disapproved Ericsson in Navellier v. Sletten (2002) 29 Cal.4th 82, 124 Cal.Rptr.2d 530, 52 P.3d 703 (Navellier). The court stated nothing in the anti-SLAPP statute categorically excludes any particular type of action from its operation. (Id. at p. 92, 124 Cal. Rptr.2d 530, 52 P.3d 703.) Conduct alleged to constitute a breach of contract may also come within constitutionally protected speech or petitioning. (Ibid.) The focus of the statute is not the form of plaintiffs cause of action, but the defendant's activity that gives rise to his asserted liability. (Ibid.)
Navellier also makes clear, however, that the anti-SLAPP statute does not bar a plaintiff from litigating an action for breach of contract or fraud that arises from the defendant's free speech or petitioning. (Navellier, supra, 29 Cal.4th at p. 93, 124 Cal.Rptr.2d 530, 52 P.3d 703.) Where a complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if plaintiffs evidence is credited, it is not subject to being stricken under the anti-SLAPP statute. (Ibid.)
Here the Kings' actions in submitting the High Density Tract Map to the planning commission and city council clearly fall within "`an act in furtherance of a person's right of petition or free speech ...,'" as defined in subdivision (e) of section 425.16. That shifts the burden to Midland to make a prima facie showing of a probability of prevailing on its complaint. (Kashian, supra, 98 Cal.App.4th at p. 906, 120 Cal.Rptr.2d 576.)
The trial court found the Kings failed to carry their burden of showing the complaint arose from an act in furtherance of their rights. It may have also considered Midland's probability of prevailing. Nevertheless, whether Midland has made a prima facie showing of merit is a question of law over which we exercise our independent judgment. (Kashian, supra, 98 Cal. App.4th at p. 906, 120 Cal.Rptr.2d 576.)
The Kings contracted to and received substantial* payment for using their best efforts to obtain the City's approval of a low density tract map. Instead, the Kings submitted and obtained preliminary approval for a High Density Tract Map. Those facts alone show a prima facie case for breach of contract. That is what is necessary for Midland to prevail. (Kashian, supra, 98 Cal.App.4th at p. 906, 120 Cal.Rptr.2d 576.) The Kings' evidence does not defeat Midland's showing as a matter of law. (Ibid.)
The Kings argue the City's uncertain regulatory climate "clouded" the processing of the original 140-lot map. But the Kings cite no authority for the proposition that a clouded regulatory environment relieves them of their obligations under the contract. Moreover, there is evidence that the City's staff recommended approval of the low density map for the Kings' property, and that the City approved low density maps for two adjacent subdivisions. A reasonable trier of fact could conclude that the Kings sought to avoid their obligations *136 to Midland's contract under the guise of concern over the regulatory environment.
The Kings argue they simply presented an alternative to the City. But the Kings did not contract to and were not being paid to present an alternative map. A reasonable trier of fact could conclude the presentation of an alternative map breached the Kings' duty to use their best efforts to obtain approval of the original map.
The Kings argue Midland cannot show a probability of success on its fraud claim. Midland's cause of action for fraud alleges: Midland's approval of the 140-lot map, instead of the original 120-lot map, was obtained by the Kings' agent's representation that the increase in the number of lots was necessary to obtain the City's approval. The Kings knew the representation was false. The 140-lot map was the result of an agreement by King with the owners of adjacent properties to shift some affordable housing requirements to the Kings' property. The' Kings received compensation for the agreement.
The Kings claim there is no substantial evidence to support the allegation that they agreed to accept affordable housing requirements from adjacent property owners. But the basis for the fraud cause of action is the false representation that the City required the 140-lot map. Whether the Kings were motivated by compensation received from adjacent property owners, or simply by their own desire to increase the number of lots is not determinative.
The Kings argue Midland cannot show it suffered damage from the misrepresentation. But even if Midland is somehow able to convince the City to rescind preliminary approval of the high density map, it would either have to start over and process a 120-lot map, or proceed with the potentially less valuable 140-lot map. That is sufficient to make a prima facie case of damage.
The judgment (order) is affirmed. Costs are awarded to respondent.
YEGAN, and COFFEE, JJ., concur.
NOTES
[1] SLAPP stands for "strategic lawsuit against public participation."
[2] All statutory references are to the Code of Civil Procedure.
[3] All further references to "King" shall refer to John King, unless clarity demands that we draw a distinction.