Filed 2/13/24  Sky Partners v. Briggs CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SKY PARTNERS, INC., et al.,<br><br>Cross-Defendants and Appellants,<br><br>v.<br><br>JUSTIN BRIGGS,<br><br>Cross-Complainant and Respondent. | A165697<br><br>(Alameda County<br>Super. Ct. No. RG21111126) |

Appellants Sky Partners, Inc. and Craig Miller, Sky Partners' CEO, appeal from the partial denial of their anti-SLAPP motion (Code Civ. Proc., § 425.16).[1]  Sky Partners owns and operates charter aircraft.  At one time, respondent Justin Briggs worked in conjunction with Sky Partners as essentially a link between individuals who wanted to charter a flight and Sky Partners which provided the aircraft.  After Briggs terminated his relationship with Sky Partners, Miller learned from a Sky Partners client that Briggs was continuing to hold himself out as working in conjunction with the charter company.  Sky Partners sued Briggs for a variety of business torts.

Briggs, in turn, counter-claimed for reputational torts based on statements Miller made to several clients after Briggs left, stating Sky

---

[1]  All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Partners had retained an attorney and was preparing to sue Briggs. Sky Partners and Miller filed an anti-SLAPP motion, which the trial court granted as to one cause of action but denied as to the remainder of Briggs's cross-complaint. The court ruled Sky Partners and Miller had carried their burden under step one of the anti-SLAPP analysis and Briggs's counter-claims were based on statements made "in connection with an issue under consideration or review by a . . . judicial body." (§ 425.16, subd. (e)(2).) However, it also ruled Briggs had carried his burden under step two of the analysis and had made a prima facie showing he would defeat the litigation privilege defense Sky Partners and Miller had interposed as to his cross-claims. Sky Partners and Miller challenge the latter ruling and claim Miller's statements are absolutely protected under the litigation privilege (Civ. Code, § 47, subd. (b)). We agree and reverse the anti-SLAPP order to the extent the trial court denied the motion.

## BACKGROUND

Sky Partners owns and operates aircraft chartered for private air travel. It also operates aircraft owned by other companies. The company was incorporated in August 2013, and shortly thereafter Briggs began working for, or with, the company. The exact nature of their relationship, i.e., whether Briggs was a Sky Partners employee or worked collaboratively in a relationship akin to a joint venture, is disputed. However, the particulars of their relationship are immaterial for purposes of the issue on appeal. What is undisputed is that Briggs worked as a broker with individuals seeking private air travel and arranged for flights on aircraft owned and/or managed by Sky Partners (as well as other air charter operators). Sky Partners, in turn, provided vendor services, as well as back-office accounting, billing, and related services to Briggs in exchange for 30 percent of the profits of each

2

flight booked. According to Briggs, both parties had an equal right to use the Sky Partners name.

At some point, the parties' relationship began to deteriorate. Briggs claims Sky Partners often delayed his " 'true up payments' " citing cash flow as its excuse and the company became less reliable in confirming receipt of client funds and processing payments to vendors. Additionally, a high-limit credit card Sky Partners had provided to Briggs was cancelled because of, according to Briggs, Sky Partners' declining business operations and loss of investor capital. On June 6, 2021, Briggs sent a one-sentence e-mail to Miller resigning from Sky Partners.

The following month, Miller contacted certain clients to inform them of Briggs's resignation. The instant dispute arose from subsequent communications with some of these clients.

Among the clients Miller contacted was Jonathan Rosenberg. In his e-mail, Miller told Rosenberg he and Briggs had parted company, that Briggs was going forward on his own, and that if Rosenberg wanted to fly on one of Sky Partners' planes in the future to contact Miller. Rosenberg replied that he anticipated continuing to work with Briggs.

Less than two weeks later, Rosenberg e-mailed Miller with the subject title "Confused." Rosenberg wrote that he was confused about which person was with which entity and he sought clarification about Miller's prior e-mail. Miller replied that he and Briggs had commenced charter operations in 2014 under the name Sky Partners, at which time he hired Briggs. Miller stated Briggs did not found or own Sky Partners. Rather, Briggs had primarily funneled charters to Sky Partners for Rosenberg and one other high-volume client. Briggs subsequently convinced the latter client to move its aircraft off Sky Partners' certificate so Briggs could manage the plane himself.

3

Rosenberg then called Miller and, according to Miller, it was during this telephone call that he realized Briggs was continuing to hold himself out as working in conjunction with Sky Partners. Rosenberg also told Miller that he was going to contact his friend, Marissa Mayer (Briggs's other high-volume client), about Briggs. Miller followed up with an e-mail to Rosenberg with information about Sky Partners' relationship with Mayer.

On August 8, Rosenberg provided Miller with copies of 18 invoices dated between June 29, 2020, and June 16, 2021, four of which were dated after Briggs's resignation, and all of which bore the Sky Partners name but requested payment to a Wells Fargo account Miller claims was "fictitious" because, while it was in Sky Partners' name, Sky Partners, in fact, did not authorize the creation of the account or have access to it. Moreover, the purported Sky Partners' address on the invoices was an address Miller understood to be Briggs's brother's address.

Rosenberg also sent Miller an invoice he had received from Briggs in June 2020 that notified Rosenberg of supposed "ADJUSTED WIRE DETAILS!" and stated "they [meaning Sky Partners] have established a new [Wells Fargo] account to separate some operations to make sure tracking is clear" and it provided "SKY Partners—Wire Instructions." The supposedly new account name was listed as Sky Partners. In light of this information, Miller concluded Rosenberg had made wire payments to Briggs's "fictitious" account and Briggs had also, without advising Rosenberg, charged a higher commission rate than the five percent Sky Partners, in fact, charged to customers.

Rosenberg then e-mailed Miller that he had concerns about having referred acquaintances to Briggs, thinking Briggs had also misled them by saying the commission rate for his services was five percent. Miller replied

on August 9, telling Rosenberg he was going to call Wells Fargo and would let Rosenberg know what the bank said about the supposedly new account. Miller continued, "I am also going to make contact with an attorney I know who, coincidently, just recently worked on a fraud/embezzlement case for a biomedical company funded by a venture capitalist who is [a] close friend of mine. I will be asking him what he suggests as next steps for you and I."

Rosenberg sent Miller another e-mail on August 19, asking how his friend, Laszlo Bock, who he copied on the e-mail, should proceed with Sky Partners invoices Briggs had sent. Rosenberg told Miller that Bock had recently completed travel coordinated by Briggs in which Briggs represented himself as affiliated with Sky Partners, and Bock now had unpaid invoices and needed advice on how to handle them. Rosenberg also inquired as to how "things stand with your attorney and law enforcement." In reply, Miller said his "attorney, who is handling both the civil and criminal lawsuits on our behalf suggested NOT to pay the invoices to [Briggs]." Miller also said that if Bock forwarded his unpaid invoices to Miller, he would determine the flight operator and cost and Bock could pay the operator directly. Miller went on to say that "our call today with the attorneys was brief and we are still uncovering issues. We are meeting again on Monday to agree on a legal strategy for moving this case forward under two separate complaints—one a civil complaint and the other a criminal complaint that will [be] separated into state criminal offenses and federal crimes." Bock, in turn, replied to Miller, provided three invoices, and said Miller could "feel free to enjoin (*sic*) me as a John Doe."

The following week, on August 27, Sky Partners filed the instant lawsuit against Briggs asserting causes of action for breach of fiduciary duty, fraud, misappropriation, intentional interference with prospective economic

relations, conversion, violations of Business and Professions Code sections 17200 and 17500, and constructive trust. The complaint alleged Briggs had outsourced flights using the Sky Partners name after he had resigned, used fictitious Sky Partners invoices, instructed clients to pay a bank account Briggs had set up, misappropriated the Sky Partners account name while falsely representing to clients that payments would be received by Sky Partners, and falsely told clients he had a commission rate of five percent. On December 2, Sky Partners filed the operative first amended complaint based on the same alleged wrongful acts.

A few days after Sky Partners filed its original complaint, Miller received an e-mail from Melinda Osterloh, another friend of Rosenberg, asking Miller for a flight operator's information to ensure it was paid. Miller replied and also provided an update on the litigation, including: Sky Partners had filed a civil complaint; a temporary restraining order had been issued; the Wells Fargo bank account had been seized; and the operator for her flight had been fully paid. Miller also told Osterloh Briggs had "fraudulently" charged her an additional 12 percent commission, not five percent, and that his attorneys recommended funds be wired to the "real" Sky Partners account.

In November 2021, Miller testified at deposition to the following: He did not file a police report and, to his knowledge, the matter had not been referred to the district attorney's office, federal prosecutors, or the FBI. When he wrote the e-mail to Rosenberg referencing his attorney handling civil and criminal lawsuits, he thought there probably would be criminal actions filed. When asked why he mentioned civil and criminal lawsuits in his e-mail, Miller answered, "I don't know. I have no idea why I put it in

there, other than the fact that I thought that's probably what was going to happen."

Three months later, in February 2022, Briggs filed a cross-complaint against Sky Partners and Miller asserting 10 causes of action, including for defamation, interference with contractual relations and with prospective business advantage, inducing breach of contract, and unfair competition, based on Miller's statements to Rosenberg, Mayer, Bock, and Osterloh. Briggs asserts Miller made false and defamatory statements, "including that Briggs is embezzling and stealing money, Briggs is engaged in and under investigation for criminal activity and fraud, and Briggs is a crook and cannot be trusted[,]" and "Briggs is engaged in and under investigation for embezzlement, criminal activity and fraud, and is dishonest and deceptive in his business dealings."

Sky Partners and Miller filed an anti-SLAPP statute motion, claiming Miller's challenged statements to the clients constituted protected activity under section 425.16, subdivision (e)(2) and were absolutely protected under the litigation privilege set forth in Civil Code section 47, subdivision (b).

After Briggs filed opposition and the trial court heard argument by counsel, the court issued an order denying the motion as to all but the cause of action for negligent interference with contractual relations. The court first ruled that while "it is a somewhat close issue[,]" Sky Partners and Miller met their burden of demonstrating that Briggs's cross-claims arose from protected activity under section 425.16, subdivision (e)(2). The court also pointed out that in his opposition Briggs failed to cite any cases analyzing the first step of the anti-SLAPP analysis generally, or section 425.16, subdivision (e)(2) specifically. The court further ruled that Briggs had established he would prevail on Sky Partners' and Miller's litigation privilege defense and had

7

demonstrated his claims had at least minimal merit. With respect to the litigation privilege, the court stated the company and Miller had not explained how Miller's statements "falsely" indicating they were bringing criminal charges against Briggs had a tendency to achieve the objects of the civil litigation, functioned as either a necessary or useful next step in the litigation process, or advanced the civil claims against Briggs.

## DISCUSSION

The anti-SLAPP statute is designed to prevent meritless lawsuits from chilling individuals' exercise of their rights of petition or free speech. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884.) A special motion to strike may be brought against claims "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) "Anti-SLAPP motions are evaluated through a two-step process. Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061.) If the plaintiff cannot make this demonstration the court will strike the claim. (*Wilson*, at p. 884.)

We review the trial court's ruling on an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325 (*Flatley*).) We consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based. (§ 425.16, subd. (b)(2).) In the second step, the "court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient

8

claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384–385.)

***Step One: Claims Arising from Protected Activity***

The trial court ruled in favor of Sky Partners and Miller as to the first step of the anti-SLAPP analysis, concluding Briggs's cross-claims arise from protected activity as defined by section 425.16, subdivision (e)(2), namely from statements by Miller "made in connection with an issue under consideration or review by a . . . judicial body." (§ 425.16, subd. (e)(2).) Accordingly, Sky Partners and Miller do not challenge this aspect of the court's anti-SLAPP ruling on appeal. Rather, they challenge the court's step-two ruling which was adverse to them.

Briggs, however, claims the trial court erred in its step-one ruling. Ordinarily, "a respondent who has not appealed from the judgment may not urge error on appeal." (*Hutchinson v. City of Sacramento* (1993) 17 Cal.App.4th 791, 798.) " ' "To obtain affirmative relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants." ' " (*Gutierrez v. Chopard USA Ltd.* (2022) 82 Cal.App.5th 383, 394.) However, a "limited exception to this rule is provided by Code of Civil Procedure section 906, which states in pertinent part: 'The respondent . . . may, without appealing from [the] judgment, request the reviewing court to and it may review any of the foregoing [described orders or rulings] for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken.' 'The purpose of the statutory

9

exception is to allow a respondent to assert a legal theory which may result in affirmance of the judgment.'" (*Hutchinson*, at p. 798.)

Even assuming we have jurisdiction to consider Briggs's challenge to the court's step-one ruling, he advances arguments on appeal that he never made in the trial court. Relying on *Flatley, supra*, 39 Cal.4th 299, he now argues Miller falsely accused him of a crime, which constitutes defamation per se and illegal conduct. However, he never made this argument in the trial court. Briggs also now maintains Miller's statements do not constitute protected activity as defined under section 425.16, subdivision (e)(2). Again, he never made such an argument in the trial court. While he included a subheading in his opposing memorandum of points and authorities that Sky Partners and Miller failed to meet their burden under step one, his argument pertained solely to the litigation privilege, an issue relevant to the step-two analysis and which we discuss shortly. In the trial court, Briggs did not discuss section 425.16, subdivision (e)(2) or offer any argument as to why Miller's statements do not fall within its provisions. Nor did he cite any cases discussing the scope of section 425.16, subdivision (e)(2). "It is axiomatic that arguments not asserted below are waived and will not be considered for the first time on appeal." (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3.) In short, Briggs forfeited the arguments he now advances as to step one. (*Ibid.*)

But even if Briggs did not forfeit his arguments, they lack merit. He is correct that in *Flatley, supra,* 39 Cal.4th at page 320, our Supreme Court held that illegal speech is not protected and the anti-SLAPP statute cannot be wielded to strike causes of action based on such speech.

"*Flatley,* however, is a very narrow exception. It applies only 'where either the defendant concedes the illegality of its conduct or the illegality is

10

conclusively shown by the evidence.' " (*Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 210.) Thus, if "a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits." (*Flatley, supra,* 39 Cal.4th at p. 316.) Indeed, the Supreme Court cautioned that "rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing" do not "necessarily constitute extortion." (*Id.* at p. 332, fn. 16.) Moreover, "the question of whether the defendant's underlying conduct was illegal as a matter of law is preliminary, and unrelated to the second prong question of whether the plaintiff has demonstrated a probability of prevailing, and the showing required to establish conduct illegal as a matter of law—either through defendant's concession or by uncontroverted and conclusive evidence—is not the same showing as the plaintiff's second prong showing of probability of prevailing."[2] (*Flatley,* at p. 320.)

Here, Sky Partners and Miller do not concede that Miller engaged in any criminal conduct, and the record before us is not remotely comparable to that in *Flatley.* In *Flatley,* there was a detailed record of sustained and

---

[2] Thus, as the courts have recognized, the *Flatley* exception only applies when the conduct is criminal, not just a violation of a statute. (See *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654 ["[o]ur reading of *Flatley* leads us to conclude that the Supreme Court's use of the phrase 'illegal' was intended to mean criminal, and not merely violative of a statute"]; *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1169 [reviewing cases]; *Price v. Operating Engineers Local Union No. 3* (2011) 195 Cal.App.4th 962, 971 [defamation is not "illegal" within the meaning of *Flatley*].)

11

egregious conduct by the defendant lawyer demanding a nine-figure settlement on threat of publicizing a supposed sexual assault, instigating a criminal investigation, and hounding Flatley around the world if the demand was not met. The demand letters, alone, consisted of a barrage of threats, highlighted in a multitude of respects to emphasize their threatening character. There were also a series of threatening telephone calls. The tenor and character of this campaign added up to only thing—extortion. (*Flatley, supra,* 39 Cal.4th at pp. 307–311.)

Similarly, in *Cohen v. Brown* (2009) 173 Cal.App.4th 302, 310–311, 317–318 (*Cohen*), the attorney's conduct, while not quite as egregious as that in *Flatley,* was extreme, culminating in the attorney preparing a false complaint to the State Bar and signing his client's name to it, followed by a lengthy e-mail that the plaintiff would "live to regret" having a complaint filed against him, the State Bar would make the plaintiff's life "a living hell" and he should immediately sign the disputed settlement checks. (*Id.* at pp. 311, 317.) The record here is not close to having the same weight and character.

As for section 425.16, subdivision (e)(2), the court in *Pech v. Doniger* (2022) 75 Cal.App.5th 443, 461–462 (*Pech*) well summarized the breadth of this definition. "Communications protected under the anti-SLAPP statute include 'any written or oral statement or writing made before a legislative, executive, or judicial proceeding' (§ 425.16, subd. (e)(1)) or 'in connection with an issue under consideration or review' in such proceedings (*id.*, subd. (e)(2)). 'Statements made in preparation for litigation or in anticipation of bringing an action fall within these categories. [Citations.]' [¶] Counseling others in anticipation of litigation or encouraging others to sue is considered protected prelitigation activity." (*Ibid.*, fn. omitted.)

12

Given the breadth with which section 425.16, subdivision (e)(2) has been applied by the courts, Miller's statements can reasonably be characterized as having been made in anticipation of bringing an action. Indeed, Miller made explicit reference to consulting with counsel about moving forward with litigation against Briggs, and Sky Partners filed suit against Briggs within six weeks of Miller's first communication with Rosenberg. (See *Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482 [law firm's suit for intentional interference with business relations based on defendant attorney's statements to former firm clients inducing them to leave firm with promises of unrealistic litigation objectives was properly subject to a special motion to strike; appellate court rejected firm's argument that lawsuit arose from defendant attorney's act of soliciting a client, concluding lawsuit arose directly from communications between the defendant attorney and the client about litigation pending against the client].)

Even assuming, "by analogy to the litigation privilege of Civil Code section 47, subdivision (b), that prelitigation statements must be made in connection with proposed litigation contemplated in good faith and under serious consideration in order to be protected under the anti-SLAPP statute" (*Pech, supra,* 75 Cal.App.5th at pp. 462–463), the limited record before us does not conclusively establish any lack of good faith by Miller or suggest Sky Partners and Miller were not, at the time, seriously considering litigation against Briggs.[3]

---

[3] *Pech* expressed serious doubt that the anti-SLAPP step one inquiry embraces such requirements. (*Pech, supra,* 75 Cal.App.5th at p. 463; accord, *RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413, 427–431.)

13

***Step Two: Probability of Prevailing***

Sky Partners and Miller maintain the trial court erred in concluding Briggs met his burden under step two of the anti-SLAPP analysis. Specifically, they claim the court erred in ruling Miller's challenged statements are not protected under the litigation privilege set forth in Civil Code section 47, subdivision (b). We agree.

"Civil Code section 47, subdivision (b) defines what is commonly known as the 'litigation privilege.' " (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 912 (*Kashian*).) The privilege presents "a substantive defense a plaintiff [or, in this case, a cross-complainant] must overcome to demonstrate a probability of prevailing." (*Flatley*, *supra*, 39 Cal.4th at p. 323.)

The privilege typically "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 (*Silberg*).) "Thus, 'communications with "some relation" to judicial proceedings' are 'absolutely immune from tort liability' by the litigation privilege [citation]." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057.) "Many cases have explained that [Civil Code] section 47(b) encompasses not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 361; see *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 [" 'communications preparatory to or in anticipation of the bringing of an action . . . are within the litigation privilege' "].) Accordingly, the privilege "is not limited to statements made during a trial or other proceedings, but

14

may extend to steps taken prior thereto, or afterwards." (*Rusheen,* at p. 1057.)

Doubt about whether the privilege applies is decided in favor of applying it. (*Kashian, supra,* 98 Cal.App.4th at p. 913.) " 'The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]' [Citation.] In order to achieve this purpose of curtailing derivative lawsuits, we have given the litigation privilege a broad interpretation." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241.)

The trial court concluded Sky Partners' and Miller's litigation privilege defense faltered on the third and fourth factors—that Miller's statements were not made " 'to achieve the objects of the litigation' " and did not have " 'some connection or logical relation to the action' " that Sky Partners subsequently filed. Specifically, the court ruled Sky Partners and Miller had not explained how the statements "falsely" indicating they were bringing criminal charges had a tendency to achieve the objects of the civil litigation, functioned as either a necessary or useful next step in the litigation process, or advanced their civil claims against Briggs. In short, the trial court ruled the litigation privilege did not apply because of Miller's postulation about pursuing criminal complaints, as well as civil litigation.

At this juncture, we briefly recap the statements by Miller at issue. The first was made in an e-mail dated August 9, 2021, responding to Rosenberg's concern about referring acquaintances to Briggs for assistance in securing charter air travel. Miller stated, "I am also going to make contact with an attorney I know who, coincidently, just recently worked on a fraud/embezzlement case for a biomedical company funded by a venture

15

capitalist who is [a] close friend of mine. I will be asking him what he suggests as next steps for you and I." The next statement was made 10 days later, in an e-mail by Miller dated August 19, responding to Rosenberg's inquiries as to what his acquaintance and another client of Briggs, Laszlo Bock, should do with invoices he had received from Briggs and "where things [stood] with your attorney and law enforcement." Miller replied his "attorney, who is handling both the civil and criminal lawsuits on our behalf suggested NOT to pay the invoices to [Briggs]." Miller continued, "our call today with the attorneys was brief and we are still uncovering other issues. We are meeting again on Monday to agree on a legal strategy for moving this case forward under two separate complaints—one a civil complaint and the other a criminal complaint that will [be] separated into state criminal offenses and federal crimes." Sky Partners filed the instant lawsuit less than six weeks after Miller first communicated with Rosenberg.

Our Supreme Court has explained, "[t]he requirement that the communication be in furtherance of the objects of the litigation is, in essence, simply part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action. A good example of an application of the principle is found in the cases holding that a statement made in a judicial proceeding is not privileged unless it has some reasonable relevancy to the subject matter of the action. [Citations.] The 'furtherance' requirement was never intended as a test of a participant's motives, morals, ethics or intent." (*Silberg, supra*, 50 Cal.3d at pp. 219–220.)

Here, Miller's statements in the e-mail exchanges with Rosenberg had "some logical relation to" the instant lawsuit Sky Partners filed shortly thereafter. In the course of these e-mail exchanges, Miller acquired salient

16

information about the misrepresentations Briggs had made in the name of Sky Partners, both as to his purported continuing affiliation with Sky Partners and the supposedly newly opened Sky Partners' bank account to which he instructed clients of his and/or Sky Partners to send payment on invoices purportedly sent by Sky Partners. In short, Miller's statements were not "extraneous" to the claims asserted in Sky Partners' complaint. (See *Silberg, supra*, 50 Cal.3d at pp. 219–220; see also *Dziubla v. Piazza* (2020) 59 Cal.App.5th 140, 155 ["Because the privilege 'attaches to any publication that has any reasonable relation to [a court] action and is made to achieve the objects of the litigation,' " court had "little trouble concluding" that e-mail to supporters railing against alleged malfeasors and asking for donations to support litigation "generally falls under [litigation privilege's] broad scope"; e-mail "informed" supporters about the litigation and "asked for their help to fund it" and thus "was written and distributed to achieve the ends of [the plaintiff's] petition for judicial relief."].)

Citing *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134 (*Rothman*), Briggs maintains the trial court correctly ruled Miller's "false" criminal accusations failed to " 'function as a necessary or useful step in the litigation process and [] serve its purposes.' " *Rothman* is readily distinguishable.

In that case, a celebrity's representatives claimed at a press conference that an attorney and his clients had falsely accused the celebrity of sexual abuse to extort money. (*Rothman, supra*, 49 Cal.App.4th at pp. 1138–1139.) The Court of Appeal concluded the litigation privilege did not extend to " 'litigating in the press.' " (*Id*. at p. 1149.) To come within the litigation privilege a statement must have a functional connection to *litigation*—the communicative *act* "must function as a necessary or useful step in the litigation process and must serve its purposes." (*Id*. at p. 1146.) The

17

statements at issue served to vindicate the celebrity in the public *press,* and while his interest in vindication in the press paralleled his interest in vindication through litigation, the press statements did not function to advance his litigation interests. (*Id.* at pp. 1147–1148.) The type of act to which the privilege affords its protection—"the uninhibited airing, discussion and resolution of disputes *in, and only in, judicial or quasi-judicial arenas*"— does not include "[p]ublic mudslinging." (*Id.* at p. 1146.) Miller's statements, in contrast, were not an effort to prevail on claims in the court of public opinion. Rather, they were expressly preparatory to filing suit.

Briggs also cites to *Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140. In that case, an employee of a technology company, along with several other employees, left to work for a competitor. (*Id.* at p. 143.) After becoming concerned its competitor was improperly soliciting its employees and customers, the company's attorney sent a letter to the competitor's chief executive officer, warning the competitor that its acts of unfair competition would not be tolerated and advising that the technology company would take advantage of its legal rights in filing a lawsuit. As to the plaintiff, specifically, the letter made the competitor " 'aware that' " the plaintiff had been in prison " 'for repeatedly and violently assaulting his wife.' " (*Id.* at pp. 143–144.) In fact, while the plaintiff had been in county jail (not prison), the conviction was for shooting a gun at an unoccupied vehicle and vandalism. (*Id.* at p. 151.) The *Nguyen* court held the litigation privilege did not apply to the letter's inclusion of references to the plaintiff's criminal record. (*Ibid.*) Not only was the recitation of the plaintiff's criminal history incorrect, "any 'connection' between such a conviction and the civil unfair competition focus of [the attorney's] demand letter [was], to be

18

charitable about it, tenuous." (*Ibid*.)  The circumstances in the instant case are, again, not remotely similar.

Briggs also claims Miller's statements were meant to harm and humiliate him, steal his clients, and put him out of business.  However, as we have recited, the litigation privilege applies "regardless [of] whether the communication was made with malice or the intent to harm.  [Citation.]  Put another way, application of the privilege does not depend on the publisher's 'motives, morals, ethics or intent.'  (*Silberg*[ ]*, supra*, 50 Cal.3d at p. 220.)" (*Kashian, supra*, 98 Cal.App.4th at p. 913; see *Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 955 [litigation privilege "is absolute and applies regardless of malice"].)  Briggs also makes a one-sentence remark that statements made to nonparticipants in the litigation, like the Sky Partners and/or Briggs clients here, are generally not privileged.  However, the litigation privilege includes "publication to nonparties with a substantial interest in the proceeding" (*Susan A. v. County of Sonoma* (1991) 2 Cal.App.4th 88, 94), and the clients here had a clear interest in Sky Partners' efforts to proceed against Briggs.

In sum, the trial court erred in denying Sky Partners' and Miller's anti-SLAPP motion on the ground Briggs would defeat their litigation privilege defense.  The litigation privilege applies and affords an absolute defense to Briggs's counter-claims.  We therefore need not, and do not, consider whether Briggs also established that his counter-claims had some minimal merit.

### Motion for Sanctions

Briggs filed a motion for sanctions pursuant to section 907 and California Rules of Court, rule 8.276, on the ground Sky Partners' and Miller's appeal was frivolous and prosecuted for the improper purpose of

19

harassing Briggs and causing delay. Given our disposition, we deny Briggs's motion without further discussion.

## DISPOSITION

The trial court's order denying appellants' special motion to strike is REVERSED as to the first through fifth and seventh through tenth causes of action in Briggs's cross-complaint, and the matter is remanded with directions that the trial court vacate the order and issue a new order granting appellants' motion in its entirety. Costs on appeal to appellants.

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Getty, J.*

**Judge of the Solano County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A165697, Sky Partners, Inc. et al. v. Briggs

21